Pasquale **CATALANO** et al.

v.

**UNITED STATES** of America and John
J. Norton, Warden, Federal Correction-
al Institution, Danbury, Connecticut.

**Civ. No. B–883.**

United States District Court,
D. Connecticut.

Oct. 9, 1974.

Dennis E. Curtis, Stephen Wizner, Robert Davis, Law Student Intern, Jerome Frank, Legal Services Organization, New Haven, Conn., for plaintiffs.

Peter C. Dorsey, U. S. Atty., Thomas Maxwell, Asst. U. S. Atty., New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

This habeas corpus case, together with a series of similar applications for relief presently pending in this District,[1] raises the issue whether the Due Process Clause of the Fifth Amendment requires that procedural rights be extended to federal prisoners prior to their classification as "Special Offenders" or "Special Cases." The petitioners were represented by court appointed counsel,[2] hearings were held at which eight witnesses testified,[3] and comprehensive briefs were filed by the parties.

### I

The petitioners, Pasquale Catalano, Mariano Ingoglia, and Donald Fontana, were, at the time this suit was instituted, inmates at the Federal Correctional Institution in Danbury, Connecticut (hereinafter "F.C.I."). They contend that they have suffered serious deprivations and grievous losses as a result of their designations as "Special Offenders" and "Special Cases" by the Bureau of Prisons. Specifically, they claim that they have been denied social furloughs, release on parole, and transfers to Community Treatment Centers. In addition, they assert they have been subjected to administrative procedures and delays not applicable to other prisoners, and that they have been stigmatized as members of organized crime without factual justification.

Petitioner Catalano was committed to the F.C.I. in the fall of 1972 after his conviction for the interstate transportation of stolen goods. Several months later, he was notified he had been classified as a "Special Offender" because of

---

1. D'Ercole v. Norton, Civil No. B–74–294 (D.Conn.1974); Castaldi v. Norton, Civil No. B–74–287 (D.Conn.1974); Agone v. Norton, Civil No. B–74–229 (D.Conn.1974); Maida v. Norton, Civil No. B–74–209 (D.Conn.1974); Mosca v. Norton, Civil No. B–74–194 (D.Conn. 1974); Cardaropoli v. Norton, Civil No. B–74–86 (D.Conn.1974).

2. Attorneys Dennis Curtis and Stephen Wizner, and Law Student Intern Robert Davis, all members of the Yale Legal Services Organization, served as counsel with extraordi-

nary competence, diligence and dedication, for which the Court is most appreciative.

3. On April 30, May 1 and May 23, 1974, the Court heard the testimony of the three petitioners; the petitioners' caseworkers, Paul Smithers and Paul Lefebvre; the Chief of Classification and Parole at the F.C.I., Jerome Edwards; the former Chief of Population Control for the Bureau of Prisons, Lawrence Butler; and the Chief Hearing Examiner of the United States Board of Parole, Bernard Wrenn.

certain information in his presentence report which reflected a "probable link with organized crime activities." Apparently this conclusion was based on Catalano's "acquaintance with the Gallo brothers" who were reputed to be key members of an organized crime syndicate in Brooklyn. According to Catalano, he was informed by his caseworker that his status as a "Special Offender" would adversely affect his chances for a social furlough, for a transfer to a halfway house and, eventually, for parole.

On February 27, 1974, the staff at the F.C.I. approved Catalano's application for a two-day furlough to visit with his young son. Ordinarily, staff approval would permit an inmate to leave the prison pursuant to his request. However, since Catalano was a "Special Offender," the staff's decision had to be referred to the Bureau of Prisons in Washington for ratification. The Bureau withheld its ruling for over five weeks until finally in April, 1974, the application was denied. In addition, despite the staff's favorable recommendation, Catalano was denied a parole.

Petitioner Ingoglia, a co-defendant of Catalano's, entered the F.C.I. in 1973 to serve a sentence of two and one-half years. He was designated a "Special Offender" in February, 1974 "due primarily to the organized nature of the offense, the sophistication that it involved, and the possibility of its connection with organized crime."

When Ingoglia applied for a transfer to a Community Treatment Center, the institution staff approved. Were it not for the "Special Offender" label on his file, Ingoglia would have been immediately sent to a halfway house. However, because of the designation Ingoglia's request was referred to the Bureau of Prisons which denied permission for the transfer. Moreover, five applications for social furloughs, all approved on the institutional level, had not been acted upon by the Bureau at the time of the hearings before this Court.

Petitioner Fontana was assigned to the F.C.I. in 1973 to serve a two and one-half year sentence for possession of stolen goods. Five months later he was informed he had been classified as a "Special Offender" because of certain information linking him with organized crime. When Fontana applied for a transfer to a halfway house, the request was denied with the notation "special offender, ineligible for transfer." After this case was commenced, the Bureau of Prisons reconsidered Fontana's status and ordered that the "Special Offender" marking be removed from his records. In compliance, prison officials merely pencilled a few lines across the classification stamped on his folder; the designation is still clearly visible on the files.

None of the three petitioners received prior notice of his "Special Offender" classification; none was afforded an opportunity to be heard, to present evidence, or to have counsel or counsel-substitute in order to contest the authorities' actions; none was provided with a written decision setting forth the factual basis for the classification.

## II

The terms "Special Offender" and "Special Case" were used interchangeably by the witnesses at trial. Caseworker Smithers stated that the notation was written on a prisoner's file if he "needed to be followed from institution to institution;" caseworker Lefebvre testified that the label indicated the inmate was "associated with organized crime activities;" and Mr. Edwards, Chief of Classification and Parole at the F.C.I., maintained that the characterization was placed on the records if there was any reason a prisoner "could not be transferred without Bureau of Prisons approval." While the testimony was not consistent on the point, it appears that a "Special Offender" designation is used to control the transfer and release of any inmate who is a state prisoner, a member of organized crime, a custody risk, a "notorious" person, or a "threat" to a high government official.

In an effort to codify the various practices concerning the use of the "Special

Offender" stamp, the Bureau of Prisons, during the pendency of this action, promulgated a series of standards to identify and tabulate information "on certain special categories of offenders who require greater case management supervision than the usual case." Bureau of Prisons Policy Statement 7900.47 (April 30, 1974). These new guidelines set forth eight categories for the "Special Offender" designation: non-federal prisoners, members of organized crime, protection cases, custody risks, subversives, notorious individuals, persons who pose a danger to high government officials, and any offender who requires "close supervision."

Prior to the issuance of these criteria, there were no written rules, regulations, instructions, or policy statements to aid the decision-maker faced with a potential "Special Case." No formalized procedures were followed prior to the application of the "Special Offender" notation on a prisoner's records. Instead, decisions were based on vague, indefinite and varying sets of guidelines. Usually the caseworker initiated the classification after a review of the contents of the inmate's file. If in doubt the caseworker might refer the question to a superior or, as one caseworker testified, simply rely on the "folklore" of prison practices. When a caseworker decided that a prisoner should be placed in a "Special Offender" status, he forwarded the suggestion to the Chief of Classification and Parole who, after independent review, either rejected or accepted the recommendation. All affirmative rulings were then referred to the Bureau of Prisons for final approval.

Under the recently enacted regulations, the warden of each prison will assign a staff member to coordinate the Special Offender Program. The institution staff will make the initial determination based on "court records, information from the Central Office, or other reliable sources." An affirmative recommendation will be reviewed by the Central Office of the Bureau of Prisons and, if confirmed, the inmate will not be transferred or be allowed to participate in community programs without prior approval of the Central Office. A stamped notation of these restrictions is to be recorded on the prisoner's file at the institution.

## III

Neither the procedures in effect at the time of trial nor the new standards grant a prisoner formal notice that he is a candidate for a "Special Offender" classification. Moreover, he is not informed that the label has been recommended or approved. Testimony revealed that in most cases the inmate first learns of his status when he requests a transfer or a furlough and is told his application must be approved at the Bureau of Prisons level; in some cases, the prisoner becomes aware of his classification by "looking over the caseworker's shoulder" and observing the markings on his file. Although upon inquiry an inmate is advised of the general reason for the designation, i. e., "organized crime", "security risk", etc., he is not apprised of the underlying evidence and is offered no opportunity to be heard or to contest the classification. His administrative remedies are, of course, preserved, Bureau of Prisons Policy Statement 2001.6 (February 14, 1974); cf. Kochie v. Norton, 343 F.Supp. 956 (D.Conn.1972); but at best these provide merely a review "on the records."

As one might expect, the most troublesome category included in the "Special Offender" class is "organized crime." This phrase, as so vividly illustrated in the testimony of the witnesses, is subject to myriad interpretations and applications. Apparently prison officials persist in applying the designation to "any person who engages in a criminal activity involving *some* systematic planning and joint venture with another or others," a definition expressly rejected by this Court in Masiello v. Norton, 364 F.Supp. 1133, 1135 (D.Conn. 1973). It appears that, to date, there has been no attempt by the Bureau of Prisons to avoid continued misconstruction and misapplication of the label by

promulgating a workable set of guidelines for decision-making to insure that the "organized crime" concept will be employed in a rational and non-discriminatory manner. The present inconsistency in attributing an "organized crime" designation to an inmate is exemplified by the fact that each of the petitioners in the instant case was characterized as a member of organized crime by the Bureau of Prisons; yet, after investigation, the Board of Parole found no basis for the classifications when the petitioners were being considered for parole release. Therefore, it seems appropriate at this point to call the government's attention again to the formula advanced in *Masiello,* which the Court perceives no valid reason to alter:

> A prisoner may be classified as a member of organized crime if the officials of the . . . Board have a reasonable basis in fact to conclude that the inmate was a prominent figure in a structured criminal syndicate composed of professional criminals who primarily rely on unlawful activity as a way of life. 364 F.Supp. at 1135.

### IV

The consequences of a "Special Offender" classification are significant. In most cases, the designation delays or precludes social furloughs, release to halfway houses and transfers to other correctional institutions; in some cases, the characterization may bar early parole.

Ordinarily, a request for a temporary leave or a transfer is considered and a decision rendered at the institutional level by the prisoner's caseworker and the prison's Advisory Committee. The inmate may personally propound his cause and the application is immediately relief is prompt. However, unlike a regular prisoner, a "Special Offender's" request for a similar dispensation must proceed through an additional step for approval in the Bureau of Prisons. Inordinate delays are common. In addition, the inmate has no personal contact with the decision-maker and, if his re-

quest is denied, the prisoner experiences anxiety, anger, bewilderment and, at times, despondency. As previously stated, institution staff approved the applications for leave of the petitioners in the case at bar, but its decisions were overruled by the Bureau of Prisons solely on the ground that the petitioners were "Special Offenders."

With respect to parole, there are several definite consequences of a "Special Offender" classification: (1) all "Special Offender" cases are automatically reviewed *en banc* by the Board of Parole in Washington; (2) the Board of Parole makes an independent survey of the underlying evidence relied on by the Bureau of Prisons in designating an inmate a "Special Offender" and, if the evidence is found wanting, the Board of Parole will not give any weight to the classification in its deliberations on the feasibility of parole for the prisoner; (3) however, if a prisoner's "Special Offender" label has a supportable basis in fact, his parole release may well be affected even to the point of exceeding the appropriate length of time prescribed by the Table of Guidelines, 28 C.F.R. § 2.20, 39 Fed.Reg. 20031 (June 5, 1974).

Thus, it is apparent to the Court that dire consequences flow from a "Special Offender" classification and that an inmate has a vital interest in the decision-making process.

### V

The government asserts, as it did in *Masiello,* that the "Special Offender" classification is merely an "internal management tool" designed "to control the transfer and to a lesser extent the correctional programs of certain inmates." Therefore, it argues, the issues raised in the instant case are matters solely within the exclusive discretion of the Bureau of Prisons, beyond the reach of the protections of the Due Process Clause. The Court, as in *Masiello,* disagrees.

■ While it is true that historically courts will avoid unnecessary intervention in and interference with the internal

administration of prisons, cf. Menechino v. Oswald, 430 F.2d 403 (2 Cir. 1970), cert. denied, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971), the broad discretionary powers vested in prison officials do have perimeters and are subject to judicial review when a prisoner suffers a substantial loss due to purely arbitrary actions of these officials. See, e. g., Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Johnson v. New York State Board of Parole, 500 F.2d 925 (2 Cir. 1974); Gomes v. Travisono, 490 F.2d 1209 (1 Cir. 1973); Sostre v. McGinnis, 442 F.2d 178 (2 Cir.), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1971).

Social furloughs, work release, transfers to Community Treatment Centers, and the opportunity for early parole are cognizable benefits extended to all prisoners at the F.C.I. These amenities are eagerly solicited and received by the inmates and obviously play a meaningful role in enhancing rehabilitation, reducing frustration, maintaining morale, and minimizing unrest in the prison setting.

■ The furlough facilitates the release transition from the institution to the community by providing the prisoner with a temporary leave to be with his family and to participate in outside educational, religious, civic and recreational activities; work release enables the inmate to master a trade and become a contributing member in society following incarceration; and the halfway house is a recognized rehabilitation facility which permits the inmate to live in a less restrictive environment and affords him the opportunity to gradually reintegrate into the community by securing a place to live, obtaining employment, and strengthening personal relationships while under supervision. Parole release is fully recognized as being of "enormous interest" to the prisoner and, in the light of the principles enunciated in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), must be treated as "a conditional liberty" entitled to due process protections. Johnson v. New York State Board of Parole, supra.

■ Thus the inmate has a large stake in being eligible for these rehabilitative programs. Yet a "Special Offender" may be disqualified from these advantages without notice and without a hearing. The disparity in the treatment of a "Special Offender" is apparent when one considers that a non-"Special Offender" must be afforded minimum due process before he may be similarly deprived of access to prison programs as a result of a violation of institutional rules. See, e. g., Newkirk v. Butler, 499 F.2d 1214 (2 Cir. 1974); Gomes v. Travisono, supra; Ault v. Holmes, 369 F.Supp. 288 (W.D.Ky.1973). The "Special Offender", who has not deviated from prescribed standards of conduct, also suffers short and long range privations but is not told why or given the opportunity to contest the charges against him. It is no wonder that when a prisoner learns of his "Special Offender" status, which will foreclose liberties extended to other prisoners, he assumes, because he does not know the facts, that prison officials acted arbitrarily and unreasonably. In his depressed state of mind, he rationalizes that he has been a victim of unlawful practices including discrimination, corruption, hearsay statements in his presentence report, and rumor, gossip and untested information relayed to the officials by hostile "confidential" informers.

■ It seems clear to the Court, therefore, that the treatment inherent in the "Special Offender" process constitutes "grievous loss." Morrissey v. Brewer, supra; Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). It is not to be implied, however, that the Court suggests the classification be discarded. The Court accepts the government's position that the "Special Offender" designation provides an expedient and effective method to call attention to an inmate who might pose a danger to others if transferred, temporarily released, or paroled. Moreover, it

is obvious that the need to control the movement of prisoners within the system is an integral aspect of prison management. Organized crime figures should not be integrated with young, less sophisticated and impressionable prisoners, nor should they be placed in a facility which would enable them to conduct any aspect of their illegal businesses; custody and escape risks must be noted for special observation and security; premature release of "notorious" persons may result in adverse publicity; inmates who are hostile to each other should be in different prisons; and the transfer of state prisoners must conform to the contractual obligations of the government.

However, while the "Special Offender" classification may facilitate prison administration, this does not excuse the lack of due process inherent in the present practices by which an inmate is accorded the special designation. Cf. Newkirk v. Butler, supra. It is the Court's view that, since there is a profound change in an inmate's status in prison due to the "Special Offender" classification, as a result of which he suffers adverse consequences, he is entitled to the basic elements of rudimentary due process. See Allen v. Nelson, 354 F.Supp. 505, 513 (N.D.Cal.), aff'd 484 F.2d 960 (9 Cir. 1973).

## VI

The final remaining issue concerns the extent of the process due. The petitioners submit that the minimum requirements of procedural due process include: (1) written notice, at least ten days prior to a hearing, containing specific allegations supporting the "Special Offender" classification; (2) the opportunity to be heard in person and to present witnesses and documentary evidence; (3) the right to confront and cross-examine witnesses; (4) the assistance of counsel or counsel-substitute; (5) a stenographic or tape recording of the hearing; (6) an impartial hearing officer; (7) a written statement by the factfinder as to the evidence relied on and the reasons for the classification;

and (8) review by the warden and, if he endorses the recommendation, the right to appeal to the Bureau of Prisons. Cf. Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Morrissey v. Brewer, supra; Goldberg v. Kelly, supra; Collins v. Hancock, 354 F.Supp. 1253 (D.N.H.1973). The government, on the other hand, contends that the new standards issued by the Bureau of Prisons provide adequate protections for the "Special Offender."

The Court agrees with neither the petitioners nor the government. It is now well established that the very nature of due process "negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Here, as in Wolff v. McDonnell, supra, there must be a balancing of the interests of the penal authorities against those of the inmate. As stated, prison officials have valid concerns which necessitate the use of the "Special Offender" classification. But, unlike most cases involving discipline for a specific act or acts, the institution's staff is not confronted with an emergency situation; there is no pressure upon the officials to act without delay to apply the "Special Offender" designation in order to punish an inmate, to protect other prisoners, or to prevent uncontrollable disturbances. Cf. Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970). Moreover, the potential impact of formalized procedures upon the penal authorities' time and convenience is minimal: only 39 of the 800 inmates at the F.C.I. are "Special Offenders."

Under these circumstances, it is the Court's opinion that fundamental fairness requires that the inmate be given at least ten days notice that a "Special Offender" classification is contemplated. The notice should provide the prisoner with a specification of the reason or reasons for the designation and a brief description of the underlying evidence relied on by the prison authorities. This notice should be sufficient to enable the inmate, if he wishes, to marshall the

facts in his defense and to controvert the charges at the hearing.

█ The inmate must be afforded a personal appearance before the decision-maker and be permitted to call witnesses and present documentary evidence. The hearing officer, of course, will have the necessary discretion "to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." Wolff v. Mc-Donnell, supra, 418 at 566, 94 S.Ct. at 2980.

█ Except in the unusual situation where the decision-maker cannot rationally determine the facts, the opportunity for confrontation and cross-examination of those furnishing evidence against the inmate is not required. The testimony disclosed that, in the overwhelming majority of the "Special Offender" cases, the source of the information against the prisoner is contained in his presentence report or in other documentary materials. The inmate should be fully informed of the nature of the evidence against him and be afforded suitable time to present his side of the case.

Counsel need not be furnished. However, if the issues are complex or the inmate appears to be unable to collect or present his evidence, he should be permitted the aid of retained counsel, counsel-substitute, or the members of the Yale Legal Services Organization at the F.C.I.

█ The hearing officer, who should not have personal knowledge of the information upon which the proposed "Special Offender" classification is based, may be appointed by the warden or the officials of the Bureau of Prisons. An inmate's caseworker shall be eligible to preside as the decision-maker. The proceedings need not be transcribed or recorded. Within a reasonable time after the hearing is concluded, the hearing officer must submit written findings in support of an affirmative opinion that a "Special Offender" classification is warranted under the facts of the case.

Finally, a recommendation for a "Special Offender" classification shall be subject to review by the Chief of Classification and Parole at the F.C.I., the warden, and ultimately the Bureau of Prisons.

For the above reasons, it is hereby Ordered:

1. That the respondents forthwith remove and totally expunge the "Special Offender" classifications from all records and files maintained by the Bureau of Prisons or any of its institutions with respect to petitioners Catalano, Ingoglia, and Fontana;

2. That the respondents are hereby enjoined from reclassifying any one of the petitioners as a "Special Offender" unless he is accorded procedural due process as set forth in this opinion.