617 F.2d 916
 Frank PUGLIESE, Appellee,
v.
W. Raymond NELSON, Warden, Federal Correctional Institution,
Danbury, Connecticut, Appellant.
John BAZZANO, Appellee,
v.
W. Raymond NELSON, Warden, Federal Correctional Institution,
Danbury, Connecticut, Appellant.
Leonard DURSO, Appellee,
v.
W. Raymond NELSON, Warden, Federal Correctional Institution,
Danbury, Connecticut, Appellant.
 Nos. 419-421, Dockets 79-2136, 79-2138 and 79-2140.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 6, 1979.
Decided March 4, 1980.
 
 Andrew S. Gordon, Atty., Dept. of Justice, Washington, D. C. (Richard Blumenthal, U. S. Atty., D. Conn., Frank Santoro, Asst. U. S. Atty., New Haven, Conn., William C. Bryson, Atty., Dept. of Justice, Washington, D. C., of counsel), for appellant.
 Donald Squires, New Haven, Conn. (Dennis E. Curtis, Stephen Wizner, Judith Resnik, Alice Bussiere, Renee Chotiner, New Haven, Conn., of counsel), for appellees Pugliese and Bazzano.
 Howard C. Eckenrode, Milford, Conn., for appellee Durso.
 Before WATERMAN, MOORE and MANSFIELD, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 This appeal raises the question of whether the Due Process Clause mandates procedural safeguards before the United States Bureau of Prisons may designate an inmate as a "Central Monitoring Case" (CMC). W. Raymond Nelson, Warden of the Federal Correctional Institution at Danbury, Connecticut, appeals from judgments of the District Court for the District of Connecticut, entered by Judge Ellen B. Burns in May, 1979, granting the petitions of three inmates of that institution, Frank Pugliese, John Bazzano and Leonard Durso, for writs of habeas corpus seeking termination of their classifications by the U.S. Bureau of Prisons as Category B "Central Monitoring Cases". The classification as a CMC could hinder or preclude a prisoner in obtaining social furloughs, work releases, participation in community activities, release to halfway houses and transfers to other correctional institutions. These obstacles may not be encountered by prisoners who are not so classified. Judge Burns found that there were procedural deficiencies in making the CMC classifications, which violated appellees' rights under the Due Process Clause of the Fifth Amendment[1] and ordered the writs to issue unless the designations were removed within 30 days. We reverse.
 
 
 2
 The United States Bureau of Prisons, Department of Justice, has adopted a central inmate monitoring system under which it controls the transfer and community activities of "certain inmates who present special needs for management" or who "pose special management considerations." See Bureau of Prisons Program Statement No. 5190.2 (June 1, 1979), formerly Policy Statement No. 7900.53A (April 7, 1976). Under this program the Bureau has established some 12 categories of inmates deemed to require such control, including those who require special protection, such as witnesses under the Witness Security Program, those who are disruptive or assaultive, and those who should for one reason or another (such as for their own protection) be separated from others or housed in particular facilities.[2] Two of the 12 categories are involved in this case and are described as follows:
 
 
 3
 "03 SOPHISTICATED CRIMINAL ACTIVITY:
 
 
 4
 Those inmates who have been involved in large scale sophisticated criminal activity.
 
 
 5
 Criteria: Activities including large numbers of associates; offenses involving over $100,000; activities over an extended period of time; international or large scale national organization; or extremely sophisticated offenses.
 
 
 6
 "05 BROAD PUBLICITY: Those inmates who have received broad publicity.
 
 
 7
 Criteria : National media coverage by syndicated news association such as UPI or AP; continued coverage by local media."[3]
 
 
 8
 Program Statement No. 5190.2 advises that the purpose of the 12 control classifications is not to preclude "inmates in the system from transfers or participation in community activities, when the inmate is otherwise eligible, but rather, to provide protection for all concerned, and to ensure the safe and orderly running of the facility." (Emphasis added). Although the necessity for special handling or control of certain categories of prisoners for safety purposes can reasonably be inferred (e. g., witnesses requiring protection or those likely to engage in assaults, escape attempts, or disruptive activities) neither Program Statement No. 5190.2 nor the appellant offer any rationale for categorizing as CMCs prisoners who have received "broad publicity" or were convicted for "sophisticated" criminal activity. We are left to speculate in the case of prisoners who have been the subject of broad publicity, whether the purpose of this CMC classification is simply to protect federal prison officials from criticism that might arise out of publicity given to the release of certain prisoners for furloughs or for community activities, or to prevent the undermining of public respect for administration of justice that the release of highly publicized prisoners might engender.[4]
 
 
 9
 The procedure used to classify a prisoner as a CMC is as follows. When either the Bureau's Central or Regional Office or the facility housing the inmate receives information indicating that the inmate may be a potential CMC and when its initial review of the supporting material supports such a designation, it may tentatively so classify the inmate. The facility's CMC Coordinator, who is immediately notified of the tentative designation, then sends the inmate a formal notice of the designation, using the language of the CMC category as described in Program Statement No. 5190.2 and stating in general terms the behavior or offense forming the basis of the designation. The notice informs the inmate that he may object to the designation and have up to 30 days to obtain and submit information or documents supporting his objections.
 
 
 10
 The prisoner's complete file is then forwarded to the "Confirming Authority" (who, depending on the category of CMC, is either the Central Office, Regional Office, or the facility's CMC Coordinator or Chief Executive Officer). The confirming authority reviews the case and notifies the prisoner in writing of the action taken. An adverse ruling may be appealed by the prisoner to the Bureau's General Counsel. Once a prisoner is designated a CMC, the designation will be reviewed on a semi-annual basis by the housing facility for any new information or change in behavior that might warrant removal of the designation.
 
 
 11
 The effect of a CMC designation on a prisoner can be substantial. Although Program Statement No. 5190.2 states that CMC monitoring is not for the purpose of precluding inmates from obtaining transfers, furloughs or participation in community activities, such as work release, and although the Bureau's policy statements governing those matters make no express reference to CMC classification, a CMC cannot obtain those benefits unless approved by the Central or Regional Office (depending on the designated category). Thus, a CMC designation usually delays and often precludes the enjoyment of the benefits.
 
 
 12
 In August, 1976, appellee Pugliese, an inmate at the federal prison in Lewisburg, Pa., who since May, 1974, had been serving a 10-year sentence for his violation of federal narcotics laws, was notified in writing that he had tentatively been designated a CMC because information indicated that his sentence involved his "participation in large-scale sophisticated criminal activity in that (he was) part of a major narcotics conspiracy and functioned as a wholesaler who dealt in multi-kilo quantities of heroin." Despite Pugliese's objection, the designation was approved, and his appeal to the Central Office denied on the ground that his involvement in a sophisticated offense was "reflected in (his) current offense for Narcotics Violation in a Major Drug Operation in New York." After his transfer in December, 1977, to the Federal Correctional Institution in Danbury, Conn., he was denied a Christmas furlough in 1978 despite his having been classified by his team unit as eligible for "community custody." Following denial of his administrative appeals, which were based on the failure of the Bureau to follow, prior to the CMC designation, the due process procedures prescribed in Catalano v. United States, 383 F.Supp. 346 (D.Conn.1974), and approved by this court in Cardaropoli v. Norton, 523 F.2d 990 (2d Cir. 1975), Pugliese filed the present petition for a writ of habeas corpus in the District of Connecticut.
 
 
 13
 John Bazzano in March, 1978, began serving a seven-year sentence at Danbury for the operation of an unlawful gambling business and the obstruction of law enforcement. Two months later he was tentatively designated a CMC because of his involvement in a "sophisticated criminal activity." After he refused to sign the notification or to indicate grounds for objection the designation was approved and a final notice of designation advised him that it was based on "involvement in criminal activities of a sophisticated nature as evidence by (his) conviction and current seven year sentence for Operating an Illegal Gambling Business which was a large scale operation covering several communities in the Pittsburgh, Pennsylvania area." His administrative appeal, also grounded on failure of the Bureau to follow the due process procedures prescribed in Catalano was denied. He then filed his habeas petition in the district court.
 
 
 14
 Leonard Durso, a prisoner who began in September, 1975, a 10-year sentence at Lewisburg for the distribution of narcotics, was in May, 1976, tentatively designated a CMC because his offense had involved a "multi-count sophisticated criminal activity" and "the distribution of kilo quantities of drugs in the tens of thousands of dollars." Despite his objection that the Bureau's facts were "grossly inaccurate," since he had been convicted of a conspiracy involving only four ounces of cocaine, his designation was approved. He then filed a habeas petition in the Middle District of Pennsylvania which was denied for his failure to have exhausted his administrative remedies. Following his transfer to Danbury, Durso's administrative appeal was denied by the Bureau on the ground that he was "currently serving a federal sentence for extortion, conspiracy to distribute and the actual distribution of large, commercial quantitities (sic) of cocaine." The Bureau considered this to be "sophisticated criminal activity" and thought that "the designation (was) warranted on that ground." Thereupon Durso filed a habeas petition in the District of Connecticut which, although initially dismissed, was remanded by us for consideration of his "constitutional claim on the merits." Durso v. Nelson, 603 F.2d 212 (2d Cir. 1979).
 
 
 15
 Faced with these three habeas petitions, Judge Burns relied principally on our decision in Cardaropoli v. Norton, 523 F.2d 990 (2d Cir. 1975), which had declared unconstitutional the "Special Offender" classification, the predecessor of the CMC system.
 
 
 16
 In Cardaropoli we found that transfers, furloughs, and participation in community programs were greatly desired by inmates and that the Special Offender classification "works serious alteration in the inmate's conditions of confinement because it hinders or precludes eligibility for these important rehabilitative programs." 523 F.2d at 995. The court concluded that designation as a Special Offender entailed a "grievous loss" which required that the inmate be afforded certain due process procedural safeguards prior to his being so designated. Judge Burns, while apparently recognizing that the recent Supreme Court decisions of Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Moody v. Daggett, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), had relied on the "entitlement" theory in lieu of a "grievous loss" test, nevertheless concluded that under the "entitlement" theory the CMC designation warranted due process protection. She reasoned that because the then Policy Statement No. 7900.53A required the Bureau to make definite findings prior to the designation of a prisoner as a CMC, the prisoners had an entitlement not to be designated a CMC, absent procedural safeguards.
 
 
 17
 The district court then considered whether the procedures followed in designating appellees as CMCs met the minimum requirements established by this Court in Catalano and Cardaropoli. Those cases required that an inmate, prior to his designation as a Special Offender, must be given (1) 10 days written notice of the tentative designation, together with the reason for the designation and a brief description of the evidence relied upon, (2) a personal appearance before an impartial decision-maker at which the inmate might present witnesses and evidence in his own behalf, and (3) a written decision by the decision-maker, subject to review, stating his reasons with at least minimal specificity.
 
 
 18
 Relying primarily on Coppola v. United States Attorney General, 455 F.Supp. 15 (D.Conn.1977), which had addressed this same issue, Judge Burns found that the procedures contained in Policy Statement No. 7900.53A and followed in these cases, although an improvement over the procedures struck down in Catalano and Cardaropoli, still failed to satisfy minimum due process requirements. Not only were appellees denied a hearing before an impartial decision-maker, but the notices of tentative designation merely repeated the broad conclusory language of the Policy Statement itself and failed to state the content and source of the evidence relied upon by the Bureau in making the designation. Nor did the Bureau state in sufficient detail its reasons for rejecting appellees' objections to the designation. Accordingly, the district court issued a writ for each of the three appellees directing (1) that they be released unless within 30 days the CMC classification was removed, (2) that such a classification was not to be made unless the prescribed due process procedures were followed, and (3) that, where relevant, appellees' applications for various benefits, such as Pugliese's desire for a furlough, be processed in the same manner as applications by non-CMC inmates.
 
 
 19
 From the decisions and judgments in the three cases the Warden of the Federal Correctional Institution at Danbury appeals. He asks us to reassess our holding in Cardaropoli in light of the principles announced in the Supreme Court decisions of Moody, Meachum and just recently in Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).
 
 DISCUSSION
 
 20
 A brief review of certain legal principles governing lawfully convicted prisoners' due process rights should be of assistance in resolving the first issue before us, which is whether a prison inmate's interest in retaining his existing custodial status and in not being classified as a CMC represents a "liberty" interest of which he may not be deprived without due process.
 
 
 21
 We start with the proposition that under the Fifth Amendment no person may be deprived by the Government of "liberty" without due process of law. Although a convicted prisoner stands lawfully deprived of much of the freedom to which he would otherwise be entitled, he is no longer treated as a slave, stripped of all protected liberty interests, Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977); Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 51 (1976); Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); he retains some portion of his constitutionally protected liberty even while in legal custody pursuant to a valid conviction. See, e. g., Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). On the other hand, we must "reject at the outset the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." (Emphasis in original). Meachum v. Fano, supra 427 U.S. at 224, 96 S.Ct. at 2538.
 
 
 22
 (T)o hold as we are urged to do that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." (Emphasis in original). Id. 225, 96 S.Ct. 2538.
 
 Such a holding
 
 23
 "(W)ould place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges. We decline to so interpret and apply the Due Process Clause. The federal courts do not sit to supervise state prisons . . . ." Id. 228-29, 96 S.Ct. 2540.
 
 
 24
 See also Moody v. Daggett, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976).
 
 
 25
 To qualify as constitutionally protectible "liberty," the prisoner's interest must be either one that is assured by statute, judicial decree or regulation, see, e. g., Wolff v. McDonnell, supra; Meachum v. Fano, supra, or one that he would normally expect to have as a matter of custom and practice or of fundamental decency and fairness. See Sostre v. McGinnis, 442 F.2d 178, 194 (2d Cir. 1971).
 
 
 26
 The line between an interest that is constitutionally protected and one that is not, as being too ephemeral, contingent or speculative, is frequently difficult to determine. Considerable weight is given to whether the alleged liberty interest is in the nature of "a bird in the hand" rather than one in the bush. A protected liberty interest is created, for example, where the inmate currently enjoys or may reasonably expect to enjoy an important and substantial benefit upon his compliance with or the occurrence of certain conditions, which may be withdrawn only for good cause. Thus, the liberty of a parolee, who has relied on an implicit promise that parole will be revoked only for good cause "although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment." Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972). Similarly, due process must be accorded when a decision is made as to whether a prisoner shall be continued on probation. Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). A prisoner's accumulated "good time" credits, which determine the time at which he will be eligible for parole, create a liberty interest of sufficient certainty and substantiality to warrant due process protection. Wolff v. McDonnell, supra.
 
 
 27
 On the other hand, a prisoner's mere hope for the possibility of freedom on parole, unsupported by some basis for his claiming entitlement to it, is insufficient, since it depends wholly on the unfettered exercise of discretion by a board or other authority. Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100 (1979). And where prison authorities have unfettered discretion to transfer prisoners from one institution to another, a prisoner's interest in avoiding transfer to an institution affording less favorable living conditions is insufficient to qualify for due process protection. Meachum v. Fano, supra. "That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." Id. 427, 225, 96 S.Ct. 2538. Nor does an incarcerated prisoner against whom a detainer has been filed for violation of parole on another conviction have a sufficient interest to entitle him to an immediate hearing, since his "loss of liberty as a parole violator does not occur until (he) is taken into custody under the warrant," even though a prompt hearing could possibly result in his serving sentences concurrently rather than consecutively. Moody v. Daggett, supra 429 U.S. at 87, 97 S.Ct. at 279.
 
 
 28
 "Petitioner also argues that the pending warrant and detainer adversely affect his prison classification and qualification for institutional programs. We have rejected the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right. In Meachum v. Fano, 427 U.S. 215 (96 S.Ct. 2523, 49 L.Ed.2d 451) (1976), for example, no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate. The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process." 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279, n.9, 50 L.Ed.2d 236 (emphasis added).
 
 
 29
 Equally important for our purposes is the Supreme Court's recent holding in Greenholtz, that a lawfully imprisoned convict's interest in the possibility of being released on parole prior to expiration of the term of his sentence does not entitle him to due process protection, absent the creation of a regulatory system giving him a right to claim parole release upon meeting certain conditions. Prior thereto we had taken the opposite view in United States ex rel. Johnson v. Chairman of New York State Board of Parole, 500 F.2d 925 (2d Cir. 1974), based mainly on the fact that the prisoner's interest in parole, though only an expectation, was enormous, representing as it does "the difference between incarceration and conditional liberty," and that most prisoners more than 70% were in fact customarily released on parole. In our view, that rendered the interest far from an ephemeral expectation. In light of Greenholtz, however, United States ex rel. Johnson no longer represents the law. Boothe v. Hammock, 605 F.2d 661 (2d Cir. 1979).
 
 
 30
 Applying the principles announced by the Supreme Court in Moody, Meachum and Greenholtz to this case, we must conclude, albeit reluctantly, that a prisoner's interest in avoiding CMC classification does not entitle him to due process protections. As with United States ex rel. Johnson, we can no longer consider our decision in Cardaropoli, decided prior to these Supreme Court decisions, as governing the facts of this case.
 
 
 31
 Under Title 18 U.S.C. §§ 4081 and 4082 the Attorney General has complete and absolute discretion with respect to the incarceration, classification and segregation of lawfully convicted prisoners.[5] Although the Attorney General may provide for prisoner transfers, § 4082(b), grant furloughs of up to 30 days, § 4082(c)(1), and permit a prisoner to work outside a prison or engage in community activities, subject to certain conditions, § 4082(c)(2), he is under no statutory obligation to exercise any of these powers with respect to any prisoner. It may be true, as we noted in Cardaropoli, that a CMC designation in practice delays or precludes a prisoner from being favorably considered for furloughs, transfers, work releases, participation in community activities and even early parole, but the fact remains that these freedoms are mere possibilities, like an unclassified prisoner's prospect of release on parole, with no prisoner (CMC or not) able to prove any state of facts which would entitle him to these freedoms.[6] Non-CMC status, in other words, merely gives a prisoner a greater chance of enjoying these freedoms, it does not guarantee them. Nor does CMC status totally foreclose the enjoyment of the benefits since the Central Monitoring Case Coordinator may grant the benefits to a CMC prisoner.[7] The prisoner's position is therefore analogous to that of a public employee lacking sufficient permanency of status or liberty interest to entitle him to constitutional due process before being terminated. See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).
 
 
 32
 "The Court has thus made clear that Congress may limit the total discretion of the Executive in firing an employee, by providing that terminations be for cause, and only for cause, and, if it does so, notice and a hearing are 'essential.'
 
 
 33
 "Where Executive discretion is not limited, there is no need for a hearing." Arnett v. Kennedy, supra at 181, 94 S.Ct. at 1657 (White, J., concurring and dissenting in part).
 
 
 34
 Appellees nevertheless contend that Policy Statement No. 5190.2 (formerly 7900.53A) limits the discretion of the Bureau to designate inmates as CMCs and thus creates a right not to be designated a CMC. Even if, as appellees contend and as the district court held, a Policy Statement, in contrast to a statute or regulation, can create a constitutionally protected liberty interest, Walker v. Hughes, 558 F.2d 1247 (6th Cir. 1977); Arsberry v. Sielaff, 586 F.2d 37 (7th Cir. 1978); Holmes v. United States Bd. of Parole, 541 F.2d 1243 (7th Cir. 1976); but cf. Solomon v. Benson, 563 F.2d 339 (7th Cir. 1977); Makis v. United States Bureau of Prisons, 606 F.2d 575 (5th Cir. 1979), we must reject the view that this Policy Statement creates any such interest. The Policy Statement does not limit in any way the Attorney General's discretion to grant or to deny the benefits of furloughs, transfers, work releases and participation in community programs.[8] The most that can be said is that the Policy Statement established procedures to be followed by the various divisions of the Bureau of Prisons in exercising its discretion with respect to prisoner designation, monitoring and control. As we stated in Cofone v. Manson, 594 F.2d 934 at 938 (2d Cir. 1979):
 
 
 35
 "Although a Due Process Clause liberty interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can derive from a statute that merely establishes procedural requirements."
 
 
 36
 The present case is clearly distinguishable from Drayton v. McCall, 584 F.2d 1208 (2d Cir. 1978), where the Parole Commission's own regulations, 28 C.F.R. § 2.34, limited the exercise of its discretion by permitting rescission of parole only under two narrowly circumscribed conditions. Here the Policy Statement simply does not disturb the Attorney General's discretion to grant or deny these benefits nor does it substantially limit his or her discretion to change a prisoner's ordinary classification to that of a CMC.[9]
 
 
 37
 We are forced to conclude, then, that a prisoner's mere expectation of benefits associated with non-CMC status does not amount to a statutory or constitutional entitlement sufficient to trigger due process protections. Absent such entitlement, the fact that the interests of a prisoner are adversely affected and that a grievous loss is suffered does not warrant constitutional protection. See Solomon v. Benson, supra at 342. If anything, the Supreme Court decisions in Meachum and Greenholtz present stronger statistical grounds for such protection than the present case in view of the large percentage of prisoners who could expect to enjoy the benefits at stake there, as compared with the apparently lower percentages here. Moreover, judicial intervention into the classification of prisoners for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities. As the Court recently warned in Bell v. Wolfish, 441 U.S. 520, 547-48, 99 S.Ct. 1861, 1878-1879, 60 L.Ed.2d 447 (1979):
 
 
 38
 "Finally, as the Court of Appeals correctly acknowledged, the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Jones v. North Carolina Prisoners' Labor Union, supra (433 U.S. 119), at 128 (97 S.Ct. 2532, at 2539, 53 L.Ed.2d 629); Procunier v. Martinez, supra (416 U.S. 396), at 404-405 (94 S.Ct. 1800, at 1807-1808, 40 L.Ed.2d 224); Cruz v. Beto, supra (405 U.S. 319), at 321 (92 S.Ct. 1079, at 1081, 31 L.Ed.2d 263); see Meachum v. Fano, 427 U.S. (215), at 228-229 (96 S.Ct. 2532, at 2540-2541, 49 L.Ed.2d 451). 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' Pell v. Procunier, supra, 417 U.S. (817), at 827 (94 S.Ct. 2800, at 2806, 41 L.Ed.2d 495). We further observe that, on occasion, prison administrators may be 'experts' only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. Procunier v. Martinez, supra, at 405 (94 S.Ct. 1800, at 1807); cf. Meachum v. Fano, supra (427 U.S.), at 229 (96 S.Ct. 2532, at 2540)." (Footnotes omitted).
 
 
 39
 Since the appellees' interest in retaining their non-CMC classifications does not for the foregoing reasons merit due process protection it becomes unnecessary for us to determine what process is due. We do note, however, that the function of the Due Process Clause in this context, if applied, would be to protect prisoners against erroneous classifications that might cause them a grievous loss, Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976), and that this risk appears largely minimized by the procedures adopted by the Bureau of Prisons, which include notices of tentative and final designations to each potential CMC, a generalized statement of the reasons and basis for the designation, permission to submit oral or written objections supported by documentary evidence, and the right of administrative appeal. While these procedures do not assure a prisoner of all of the due process rights required by Cardaropoli and Catalano (e. g., more detailed notice and specific evidence, a hearing before an impartial decision-maker at which the prisoner would have the right personally to appear and be heard, and a written statement of specific reasons for the decision), they provide a substantial degree of the protection demanded.
 
 
 40
 Since appellees fail, under principles laid down by recent Supreme Court decisions, to demonstrate the existence of a liberty interest entitled to protection under the Fifth Amendment's Due Process Clause beyond that already provided for in Policy Statements of the U.S. Department of Justice's Prison System, the judgments of the district court are reversed and the cases remanded with directions to dismiss appellees' habeas petitions.
 
 
 
 [1]
 Since the appellees are imprisoned in a federal institution the Fifth Amendment would apply, as distinguished from the Due Process Clause of the Fourteenth Amendment
 
 
 [2]
 The only significant difference between Policy Statement No. 7900.53A, which was in effect when appellees were designated CMCs and when Judge Burns rendered her decision below, and its replacement, Program Statement No. 5190.2, is that the three broad subcategories of CMCs provided for in Policy Statement No. 7900.53A have been divided into 12 specific categories
 
 
 [3]
 Subcategories 03 and 05 were formerly called Category B-3. See Policy Statement No. 7900.53A. All three appellees were designated Category B-3 cases
 
 
 [4]
 Except for the ambiguities noted, the important penological function of the CMC classifications involved here can hardly be open to serious doubt. As was pointed out in Catalano v. United States, 383 F.Supp. 346, 351-52 (D.Conn.1974):
 "The Court accepts the government's position that the 'Special Offender' designation provides an expedient and effective method to call attention to an inmate who might pose a danger to others if transferred, temporarily released, or paroled. Moreover, it is obvious that the need to control the movement of prisoners within the system is an integral aspect of prison management. Organized crime figures should not be integrated with young, less sophisticated and impressionable prisoners, nor should they be placed in a facility which would enable them to conduct any aspect of their illegal businesses; custody and escape risks must be noted for special observation and security; premature release of 'notorious' persons may result in adverse publicity; inmates who are hostile to each other should be in different prisons; and the transfer of state prisoners must conform to the contractual obligations of the government."
 
 
 [5]
 This broad discretionary authority has been delegated by the Attorney General to the Bureau of Prisons, 28 C.F.R. §§ 50.95, 0.96 (1979)
 
 
 [6]
 For instance, although a prisoner "may " be furloughed or granted a work release upon meeting certain conditions, nothing in relevant statutes, §§ 4082(c)(1) and (c)(2), regulations or Policy Statement No. 5280.1, §§ 5, 7, 9, and Policy Statement No. 5328.2, provide that in such event he "shall " be so released. See Smith v. Saxbe, 183 U.S.App.D.C. 210, 215, 562 F.2d 729, 734 (D.C.Cir.1977) ("Since section 4082(c)(1) confers no right on a prisoner to furlough which would be defeasible only upon specified events, plaintiff's interest in furlough cannot be characterized as a 'liberty' interest originating in law.") Because § 4082(b) explicitly commits prison transfer decisions to the discretion of the Attorney General, a prisoner also has no liberty interest in avoiding, Meachum v. Fano, supra; Smith v. Saxbe, supra, or obtaining a transfer
 
 
 [7]
 In the present case, for example, appellees Durso and Bazzano received transfers in spite of their CMC status
 
 
 [8]
 See note 6, supra, and accompanying text. One obvious problem is that if a Policy Statement were held to create a liberty interest protected by the Due Process Clause, prison administrators might then opt in favor of revoking such Statements rather than be burdened with such additional due process procedures as would be prescribed
 
 
 [9]
 We do not, of course, suggest that the Bureau is free to disregard its own regulations or Policy Statements in making CMC designations, nor need we address that question since appellees do not contend that the Bureau has violated the Policy Statement