Norris WILLIAMS, Plaintiff,

v.

Benjamin WARD, Individually and in his official capacity as Commissioner of the Department of Corrections, Jackie McMickens, Individually and in her official capacity as Chief of Operations for the Department of Corrections, John Cunningham, Individually and in his official capacity as Warden for the Department of Corrections, and William Cogdell, individually and in his official capacity as Warden for the Department of Corrections, Defendants.

No. CV–81–1416.

United States District Court,
E.D. New York.

Aug. 11, 1982.

Norris Williams, pro se.

Frederick A.O. Schwarz, Jr., Corp. Counsel, Gregg M. Mashberg, New York City, and Diane J. Morgenroth, Brooklyn, for defendants.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Plaintiff Norris Williams ("Williams") formerly and presently an inmate at the Brooklyn House of Detention for Men ("BHDM") located at 275 Atlantic Avenue, Brooklyn, who was transferred for a period to the House of Detention for Men on Rikers Island ("Rikers Island"), has brought a pro se action pursuant to 42 U.S.C. § 1983 against four defendants employed by the New York City Department of Corrections. Two of the defendants, John Cunningham ("Cunningham") and William Cognell ("Cognell"), were personally served on May 14, 1981. The defendants, Benjamin Ward ("Ward") and Jacqueline McMickens

("McMickens") were personally served on May 29, 1981. The defendant Cunningham is the Warden of the BHDM and the defendant Codgell is the Deputy Warden of Security at the same facility. The defendant Ward is the Commissioner of the Department of Corrections of the City of New York and the defendant McMickens is Chief of Operations of the same agency.

In this action Williams alleges that his constitutional rights were violated because he was classified as a central monitored case ("CMC") and transferred from Rikers Island to the maximum security section of BHDM on April 30, 1981 without being afforded a due process hearing either before or after the transfer. Williams also alleges constitutional deprivations based on alleged unsanitary conditions existing for one night in his cell, the failure to provide him with free toothpaste, toothbrush and sheets and an inability to sleep well due to a bright light.

For the reasons set forth below, the defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there exists no genuine issue as to any material fact is hereby granted.

### Statement of Facts

On April 30, 1981, the defendant McMickens ordered that plaintiff be classified as a CMC and transferred from Rikers Island to the maximum security section of BHDM. McMickens ordered the transfer on the basis of confidential information she had received that plaintiff, along with three other inmates, was planning an escape from Rikers Island Block # 1A area. It is revealed to the court that McMickens relied on the discovery of a Correction Officer that screws in the lower panel of a window in Block # 1A had been removed and that a panel of the window had been pulled away from the frame.

On April 30, 1981, prior to his admission to the maximum security unit at BHDM, Williams was given an initial admission interview by Captain Richard Gumbs in which he denied knowledge of an escape plan.

Williams maintains this position of denial to date. Captain Gumbs also provided plaintiff with a written explanation of his classification as a maximum security detainee and an information sheet on maximum security. In his affidavit, Warden Cunningham maintains that plaintiff was requested to acknowledge in writing the receipt of those materials but refused to do so.

On the following day, Williams filled out an interview slip on which he requested a hearing relating to his maximum security classification. Plaintiff was not afforded a hearing but Captain Gumbs explained to Williams that he had the right to present an appeal to the Director of Operations which could only be submitted on appeals form entitled, "Inmate Appeal of Maximum Security Status." Accordingly, Warden Cunningham attests to the court that Williams was given that form and requested to complete it. Williams refused to accept the appeals form, demanding instead "regular stationery with no legal implications."

Warden Cunningham maintains that although Williams was repeatedly advised of his right to an appeal, he never submitted an appeal form in order to activate the appeals process. However, plaintiff's status as a maximum security inmate was reviewed monthly at BHDM hearings. On May 28, June 23 and July 22, 1981, Williams was afforded an opportunity to challenge his classification. At Williams' first hearing he requested that the hearing officer "Go away." However, at his June 23 and July 22, 1981 hearings plaintiff appeared but did not attempt to present any evidence. After reviewing the evidence submitted at the hearings, the hearing officers recommended that plaintiff remain in maximum security. This recommendation was adopted by Warden Cunningham.

Upon plaintiff's transfer to BHDM, Warden Cunningham maintains that Williams was given a complete set of linens. In addition, Cunningham asserts that Williams' cell was inspected and found to be clean, including the toilet and sink which were in working order. Williams states that he was not issued new supplies, i.e.,

toothbrush and soap. This court accepts the explanation of Warden Cunningham that because Williams was not a new inmate at the time of his transfer it was expected that he would bring his supplies from Rikers to BHDM. However, Cunningham asserts that those articles would have been readily available to Williams if requested.

Plaintiff's cell was equipped with an overhead light fixture whose switch was located outside his cell. Warden Cunningham asserts that upon request to a correction officer, plaintiff could have had the light turned off. An overhead light was also located in the hallway outside of Williams' cell. For security reasons, hallway lights throughout BHDM remain on twenty-four hours a day.

Williams remained in the maximum security unit at BHDM until July 10, 1981, when he was transferred back to Rikers Island. On January 27, 1982, plaintiff was again transferred to BHDM. Williams is presently incarcerated at the Downstate Correctional Facility.

This action was filed on May 12, 1981. Defendants answered on July 30, 1981, and now move for summary judgment.

State actions which carry adverse consequences for prison inmates do not automatically activate a due process right. *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976). To hold "that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). Thus, the Supreme Court has held that the Fourteenth Amendment does not implicate a liberty interest which would entitle state (convicted) prisoners to a pretransfer hearing when they are transferred from one prison to another in the absence of a state law or practice conditioning such transfers on proof of serious misconduct or

the occurrence of other events. *Meachum, supra,* 427 U.S. at 229, 96 S.Ct. at 2540. *See also, Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (prisoners are not entitled to a due process hearing to challenge a prison official's discretionary action). In *Pugliese v. Nelson,* 617 F.2d 916 (2d Cir.1980) the Second Circuit Court of Appeals held that the due process clause did not mandate procedural safeguards prior to classification of federal (convicted) prisoners as a CMC. The Second Circuit held that such classification did not give rise to a liberty interest subject to due process safeguards, even though the classification "could hinder or preclude a prisoner in obtaining social furloughs, work releases, participation in community activities, release to halfway houses and transfer to other correctional institutions." *Pugliese, supra,* 617 F.2d at 918.

In the instant action, plaintiff Williams was a pre-trial detainee when he was transferred to maximum security. Pretrial detainees are "persons who have been charged with a crime but who have not yet been tried on the charge." *Bell v. Wolfish,* 441 U.S. 520, 523, 99 S.Ct. 1861, 1865, 60 L.Ed.2d 447 (1979). The *Bell* court held that in considering the constitutionality of conditions of pretrial detention, the proper inquiry is whether those restrictions amount to punishment of the detainee. 441 U.S. at 535, 99 S.Ct. at 1871. *See also, Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981); *Aziz v. LeFevre,* 642 F.2d 1109 (2d Cir.1981). In *Bell v. Wolfish* pretrial inmates detained at the Metropolitan Correctional Center (MCC) in New York City charged that they had been deprived of their statutory and constitutional rights as a result of, *inter alia,* lengthy detainments, overcrowded conditions, needless limitations on movement, deficient recreational, educational and employment opportunities, improper searches, and unreasonable restrictions on the receipt of personal items and books. *Bell v. Wolfish,* 441 U.S. at 526–27, 99 S.Ct. at 1867–68. Articulating a "hands-off" principle, the Supreme Court declined to enjoin the institutional practices and noted that,

[T]he problems that arise in the day-to-day operations of the correction facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain security. 441 U.S. at 547, 99 S.Ct. at 1878.

The *Bell* court deferred to the informed, discretionary decisions of jail administrators. *See Feeley v. Sampson,* 570 F.2d 364 (1st Cir.1978); *Main Road v. Aytch,* 565 F.2d 54 (3d Cir.1977). The *Bell* court stated that impositions on detainees need not be restricted to ensuring their court presence, but may also be based on the "legitimate operational concerns" of security and order of the institution, and the prevention of weapons and illicit drugs from reaching the detainees. *Bell, supra,* 441 U.S. at 540, 99 S.Ct. at 1874. The *Bell* court asserted that restrictions on both inmates and detainees, even those which limit constitutional liberties, are to be evaluated in light of the administrative objective of institutional security. *Bell, supra,* at 546–47, 99 S.Ct. at 1877–78. Thus, the rights of inmates and detainees are similar in that the rationales for their limited freedom are analogous.

■ Government officials may impose restraints on pre-trial detainees which are reasonably related to legitimate governmental objectives and do not amount to punishment, even if the restraints cause discomfort to prisoners. *Bell v. Wolfish, supra,* at 538, 99 S.Ct. at 1873. In determining whether a restriction constitutes punishment, the *Bell* court enunciated the following relevant factors: whether there is punitive intent on the part of detention officials, whether the disability is rationally related to a legitimate non-punitive governmental objective, and whether the disability is excessive in relation to that purpose. *Bell, supra,* at 538–39, 99 S.Ct. at 1873–74. Thus, the government may institute restraints designed to maintain security and order in correctional facilities.

■ The *Bell* court acknowledged that "the effective management of the detention facility" as well as the "ensuring of detainees' presence at trial" constitute valid objectives to justify imposition of conditions and restrictions of pretrial detention. As long as they are motivated by such legitimate governmental objectives, conditions and restrictions of pretrial detention are not susceptible to any inference that they are punitive. "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell v. Wolfish, supra,* at 540, 99 S.Ct. at 1874. In the instant case, Williams' transfer to maximum security was based on information that he planned an escape from Rikers Island. Thus, the BHDM officials acted reasonably, not punitively, in order to maintain institutional security, a legitimate governmental objective, and Williams has not been denied any constitutionally protected rights.[1]

1. Although federal law does not entitle Williams to a due process hearing upon his transfer to maximum security, Williams is accorded certain safeguards by virtue of a consent decree approved by Judge Lasker in *Detainees of the Brooklyn House of Detention v. Malcolm,* 73 Civ. 261 (S.D.N.Y.1979). As reflected in the "Information Sheet" distributed to BHD inmates, the consent decree has led to the availability of procedures to ensure that an inmate is not arbitrarily placed in administrative segregation and to afford the inmate a hearing on his classification. However, although the decree sets forth specific procedures to be followed when a dispute arises, it contains no provision for the maintenance of an individual inmate's suit for damages or injunctive relief. Thus, Williams does not have standing to maintain the instant § 1983 action for alleged violation of his rights under the consent decree. *See, Uniformed Firefighters Association v. City of New York,* 676 F.2d 20 (2d Cir.1982) (§ 1983 suit cannot be utilized to redress a statutory violation if the governing statute provides an exclusive remedy for violating its terms).

Although Williams' hearing request on May 3 was not granted, the totality of procedures followed by BHDM officials were not only in the spirit of the consent decree, but also reflected substantial compliance with its enumerated safeguards. Defendant Cunningham affirms to

Williams also alleges that certain conditions at the BHDM violate federal constitutional law. Specifically, Williams alleges denial for one night of toothpaste, toothbrush, clean sheets, clean cell and inability to sleep due to light shining in his cell.

■ Federal court deference to administrative officials in the management of penal institutions has been recognized in the absence of deprivations which represent constitutional abuses. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Here, the circumstances alleged in the complaint are not so precarious to safety as to warrant federal judicial intervention.

■ While the court is aware that the constitutional proscription against cruel and unusual punishment is applicable to conditions of incarceration, *Todaro v. Ward,* 565 F.2d 48 (2d Cir.1977); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir.1977); *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974), no rational argument can be made to support the plaintiff's claim that the conditions at BHDM amount to cruel and unusual punishment and violate a federal constitutional right. *See Bennett v. Passic,* 545 F.2d 1260 (10th Cir.1976); *Martinez v. Evans,* 444 F.Supp. 191 (D.Col.1978).

■ The Constitution only requires that prisoners not be subjected to conditions so uninhabitable as to be shocking. *McLaughlin v. Royster,* 346 F.Supp. 297 (E.D.Va. 1972). The circumstances alleged herein do not "shock the general conscience" nor are they "intolerable to fundamental fairness" to an extent that violates the plaintiff's constitutional rights. *See Bennett v. Passic,* 545 F.2d 1260 (10th Cir.1976).

Accordingly, the defendants' motion for summary judgment is granted and the action is hereby dismissed.

So Ordered.

this court that prior to Williams' hearing request, he was afforded verbal and written explanation of his transfer to maximum security as well as opportunity to respond. Williams did not offer any basis to warrant his release

from maximum security. Also, Williams did not avail himself of the appeals process which was repeatedly explained to him at each monthly interview.