Walter James GILLIAM, Plaintiff,

v.

J. Michael QUINLAN, John Michael Brown, Ann D. Bartolo, Carolyn V. Rickards, Michael Pugh, Defendants.

No. 84 Civ. 2151 (DNE).

United States District Court, S.D. New York.

Feb. 25, 1985.

Walter James Gilliam, pro se.

Jorge Guttlein, Asst. U.S. Atty., S.D. N.Y., New York City, for defendants.

## ORDER

EDELSTEIN, District Judge:

WHEREAS on March 14, 1984, plaintiff, then an inmate at the Federal Correctional Institute at Otisville, New York ("FCI"), commenced this action, *pro se,* pursuant to 42 U.S.C. § 1983, for damages and injunctive relief against five officials and employees of FCI; and

WHEREAS on March 27, 1984, the court referred the case to Magistrate Michael H. Dolinger, pursuant to 28 U.S.C. § 636, to make findings and recommendations with respect to the complaint; and

WHEREAS plaintiff in his complaint alleges that: (1) defendants on two occasions wrongfully denied plaintiff a furlough; (2) defendants wrongfully denied plaintiff an earned vacation; (3) beginning January 20, 1984, defendants denied plaintiff mailing privileges and repeatedly tampered with plaintiff's outgoing mail; (4) defendant Michael Pugh altered plaintiff's legal documents to deprive plaintiff of privileges to which he was otherwise entitled; (5) defendants harassed plaintiff by removing a typewriter from his room and by searching his cell almost daily; and (6) the above actions were taken because of defendants' hostility towards plaintiff's religious beliefs; and

WHEREAS defendants have moved for summary judgment or, in the alternative,

to dismiss, and plaintiff has cross-moved for a preliminary injunction; and

WHEREAS by Report and Recommendation dated January 15, 1985, the Magistrate recommended that plaintiff's claim based on the denial of furlough and vacation requests be dismissed because they do not state a constitutional claim; and

WHEREAS the due process clause of the fourteenth amendment does not provide a liberty interest to prisoner furloughs and vacations, *cf. Greenholz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979) (no "constitutional or inherent" right to parole); *Wolff v. McDonnel,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) ("Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison"); and

WHEREAS the regulations governing the grant of furloughs, 28 C.F.R. § 570.30 *et seq.,* and vacations, 28 C.F.R. § 345, do not provide the type of discretion-limiting standards that would give an inmate a liberty interest, *cf. Marciano v. Coughlin,* 510 F.Supp. 1034, 1037 (E.D.N.Y.1981) (no liberty interest created by New York furlough statute); *Wright v. Cuyler,* 517 F.Supp. 637, 641–42 (E.D.Pa.1981) (no liberty interest created by Pennsylvania furlough statute); and

WHEREAS the Magistrate recommended that plaintiff's claim based on defendants' denial of outgoing mail privileges be dismissed; and

WHEREAS prison regulations that infringe on a prisoner's right to communicate with others by mail must "further an important or substantial government interest unrelated to the suppression of expression," and "be no greater than is necessary or essential to the protection of the particular government interest involved," *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); and

WHEREAS the Magistrate found that based on the *Martinez* standard, plaintiff has stated a constitutional claim, because the defendants could have furthered the government's substantial interest by simply prohibiting plaintiff's correspondence with Ms. McGill, the woman he allegedly threatened; and

WHEREAS the Magistrate recommended, however, that these claims be dismissed on the ground of defendants' qualified or good faith immunity; and

WHEREAS the defense of qualified immunity is "available to prison officials as a defense from liability for damages for actions taken in their official capacities," *Security & Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 210 (2d Cir.1984), provided the prison officials can show that "their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Wyler v. United States,* 725 F.2d 156, 159 (2d Cir.1983); and

WHEREAS the Magistrate found that because the defendants "operated in an area in which the law was not charted clearly," *Carey, supra,* 737 F.2d at 211, and relied on the prison rules and regulations in effect at the time, *id.,* defendants are immune from damages under the *Harlow* standard, *see* Magistrate's Report at 28–30; and

WHEREAS the Second Circuit recently has stated that the law in the area of prisoner's first amendment rights has undergone substantial revision, *Heimerle v. Attorney General,* 753 F.2d 10, 11 (2d Cir. 1985), and has sought in a lengthy recent opinion to clarify the law relating to prisoners' first amendment rights, *Wali v. Coughlin,* 754 F.2d 1015 (2d Cir.1985); and

WHEREAS the Magistrate found, and the court agrees, that there are no material issues of fact with respect to the mailing restriction claim; and

WHEREAS plaintiff has not alleged any injury from the restriction, in that he requested and was denied permission to correspond with others; and

WHEREAS the Magistrate recommended that plaintiff's claim of mail tampering be dismissed because plaintiff has not, either in his complaint or in subsequent papers, stated in detail the factual basis of the claim; and

WHEREAS plaintiff alleges that defendant Pugh altered a letter from the New York City Central Warrant Unit which reported that plaintiff's detainer had been vacated on April 26, 1984; and

WHEREAS the Magistrate found this "conclusory allegation ... entirely unsubstantiated and insufficient to avoid summary judgment"; and

WHEREAS the plaintiff filed Objections to the Magistrate's Report, dated January 22, 23 and 27, 1985; and

WHEREAS the court finds nothing in these objections that refutes the findings and recommendations of the Magistrate; and

WHEREAS the Magistrate further recommended that plaintiff's motion for a preliminary injunction be denied as moot, because plaintiff was released from the FCI on August 30, 1984; and

WHEREAS the Magistrate recommended that plaintiff's claims that defendants interfered with plaintiff's use of a typewriter and searched his room almost on a daily basis be dismissed for failure to state a constitutional claim; and

WHEREAS the Magistrate recommended that plaintiff's remaining claims of religious-based harassment be dismissed as impermissibly vague; and

WHEREAS the court hereby adopts the Magistrate's findings and recommendations,

IT IS HEREBY ORDERED that plaintiff's motion for a preliminary injunction is denied.

IT IS HEREBY FURTHER ORDERED that defendants' motion for summary judgment is granted.

IT IS HEREBY FURTHER ORDERED that the case is dismissed.

## REPORT AND RECOMMENDATION

### January 15, 1985

MICHAEL H. DOLLINGER, United States Magistrate:

On March 14, 1984, plaintiff Walter James Gilliam, then an inmate at the Federal Correctional Institution at Otisville, New York ("FCI"), commenced this action for money damages and injunctive relief against five officials and employees of the FCI.[1] The complaint named defendants in both their official and their individual capacities, asserting that they had conspired to violate various of plaintiff's constitutional rights, and requesting $12,000,000.00 in damages and an injunction against further harassment.

This case was referred to me by the Honorable David N. Edelstein, United States District Judge, to report and recom-

---

1. J. Michael Quinlan, is the Chief Executive Officer ("Warden") of the Federal Correctional Institution at Otisville. *Affidavit of J. Michael Quinlan,* sworn to May 11, 1984 at ¶¶ 1, 2. John Michael Brown is a Correctional Programs Specialist ("Unit Manager") of Unit Two at Otisville. He has supervisory responsibility and administrative authority for the Unit and staff and is responsible for the planning and development of all unit activities. *Affidavit of John Michael Brown,* sworn to May 15, 1984 at ¶ 1. Ann D. Bartolo, who is a case manager at Otisville, is responsible for the Unit 2B classification, treatment and parole procedures. *Affidavit of Ann D. Bartolo,* sworn to May 11, 1984 at ¶ 1. Carolyn V. Rickards, who is a Unit Manager at Otisville, is responsible for program coordina-

tion and direction, planning, organizing, implementation and evaluation of all phases of her Unit's correctional treatment program. Rickards was plaintiff's Unit Manager from October 13, 1983 through February 4, 1984. *Affidavit of Carolyn V. Rickards,* sworn to May 11, 1984 at ¶ 1.

Michael Pugh is an Executive Assistant at Otisville. In that capacity he has supervisory responsibilities that include case management activities and programs, and the development of plans, policies and programs for institution management. He serves as the Warden's representative in investigating and resolving informally specific inmate problems. *Affidavit of Michael Pugh,* sworn to May 11, 1984 at ¶ 1.

mend a final disposition of the matter. Presently pending before me are defendants' motions to dismiss or for summary judgment and plaintiff's subsequently filed motion for "a restraining order." For the reasons that follow, I recommend that defendants' motions be granted and that plaintiff's motion, which is moot, be denied.

## I. *Proceedings to Date*

By his complaint plaintiff alleged in substance (1) that on December 20, 1983 defendants Carolyn Rickards and Ann D. Bartolo conspired and lied to wrongfully deny him a furlough; (2) that on December 5, 1983 Rickards and Bartolo wrongfully deprived him of an earned vacation; (3) that beginning on January 20, 1984 plaintiff was wrongfully deprived of certain mailing privileges; (4) that on March 1, 1984 plaintiff was again wrongfully denied a furlough; (5) that defendants repeatedly tampered with plaintiff's outgoing mail; (6) that the above actions were undertaken because of hostility towards plaintiff's religious beliefs; and (7) that defendant Michael Pugh altered plaintiff's legal documents to deprive plaintiff of privileges to which he was otherwise entitled.

The scope of plaintiff's charges was expanded on April 13, 1984 by the filing of a "Motion Requesting that the Court Order a Restaining Order Against All Defendants Forthwith ...," which this Court deemed to be a motion for a preliminary injunction. *See* Order dated April 26, 1984. In his motion plaintiff alleged in general terms that defendant John Brown was deliberately preventing him from doing his legal work, that his room was being searched almost daily, that some of his religious materials were missing, and that he was in fear for his life.

On May 22, 1984 defendants moved to dismiss plaintiff's complaint, or in the alternative, for summary judgment, and submitted papers as well in opposition to plaintiff's injunction motion. The principal thrust of defendants' motion is that the various administrative and disciplinary measures of which plaintiff complains are entirely legitimate internal disciplinary measures undertaken by the correctional authorities in the exercise of their recognized discretion. They further claim both absolute and qualified immunity from damage liability, and in addition assert they have not been properly served.

## II. *Statement of Facts*

Since defendants have moved for summary judgment, I will briefly summarize, in chronological order, those facts pertinent to plaintiff's various claims that are not in genuine dispute. As will become evident, the lack of genuine dispute as to the material facts permits entry of judgment at this preliminary stage of the litigation.

### A. *Introduction*

On August 6, 1982 plaintiff was convicted of possession of a stolen United States Treasury check in violation of 18 U.S.C. § 641 and sentenced to a four-year term of imprisonment. (*See* Declaration of Jorge Guttlein, Esq., dated May 22, 1984, Exh. A.) Following his conviction plaintiff was incarcerated at the FCI on November 15, 1982. (Brown Affidavit at ¶ 3.) Although still incarcerated at FCI at the time that he commenced this action, plaintiff has since been released to a "halfway house" in Brooklyn. (*See* Plaintiff's Notice of Objection dated September 25, 1984 at third page.)

### B. *Denial of Plaintiff's Vacation*

On December 2, 1983 plaintiff received an incident report for being in an unauthorized area; the basis for this report was that plaintiff had remained in his cell when he should have been at work, an offense deemed by the prison authorities to be of "moderate severity." (Rickards Affidavit at ¶ 16 & Exh. 6; Complaint, ¶ 5.) Plaintiff appeared before the Unit Discipline Committee ("UDC") on December 5, 1983 for a hearing on the incident. The UDC found plaintiff guilty and assigned him five hours of extra duty. (*Id.;* Rickards Affidavit at ¶¶ 15, 16.)

On the same day, plaintiff's work supervisor informed plaintiff's Unit Classifica-

tion Team ("UCT") that plaintiff had requested a vacation from work duties for the week of December 11 through December 17, 1983. (Rickards Affidavit at ¶ 17 & Exh. 8.) Defendant Rickards instructed defendant Bartolo, plaintiff's case worker, that the request should be denied since plaintiff did not meet the eligibility requirements set forth in Institution Supplement No. 5250.101 (CN–2), specifically the requirement that the inmate must go "at least six months without an incident report in the moderate ... category." (See Rickards Affidavit at ¶ 18 & Exh. 5.) Based upon this instruction, it appears that Bartolo notified plaintiff that he was ineligible for a vacation. (Bartolo Affidavit at ¶¶ 11, 12.)

### C. *Plaintiff's First Furlough Request*

It is unclear when plaintiff submitted his first furlough request, but the request was still under consideration as of December 21, 1983. On that day J. Robert Burke, then Acting Warden, informed Rickards that Warden Quinlan had received a telephone call from a woman named Marie McGill Murray, who claimed that plaintiff had sent her threatening letters. (Affidavit of J. Robert Burke, sworn to September 17, 1984 at ¶¶ 9–12; Rickards Affidavit at ¶ 5.)

Plaintiff came before the UCT that same day for consideration of his furlough request. The UCT was composed of Rickards, Bartolo, and three other prison officers. The UCT denied plaintiff's furlough request, relying on Program Statement 5280.3, Section 8(a), which provides that a furlough may not be granted if the inmate's "presence in the community could ... create unusual concern." (Rickards Affidavit, ¶¶ 5–10 & Exh. 1; Bartolo Affidavit at ¶¶ 6–9 & Exhs. A, B.) The UCT based its decision on the fact that plaintiff was seeking a furlough in the same district as Ms. Murray's residence and its conclusion that his release in that neighborhood could pose a danger to Ms. Murray. (See Rickards Affidavit ¶ 10.) The UCT decision was subsequently memorialized in a written memorandum, which was delivered to plaintiff on January 23, 1984. (Rickards Affidavit at ¶ 11 & Exhs. 2 & 3.)

### D. *Plaintiff's Placement on Restricted General Correspondence*

Under Bureau of Prisons Policy, Program Statement 5265.6, Section 7, the Warden has the discretion to place an inmate on restricted general correspondence if the inmate has violated correspondence regulations. (See Rickards Affidavit at ¶ 13 & Exh. 4.) Under Institutional Supplement 5265.6, this authority has been delegated to the UDC. (*Ibid.*) If placed on this restricted correspondence list, the inmate must be limited to a maximum of fifteen people with whom he may correspond without prior permission of the prison authorities. This procedure does not limit the inmate's privileged correspondence, which includes his legal mail. Moreover the inmate may request permission to correspond with people not on the restricted list.

Based on these regulations, plaintiff was notified in writing on January 20, 1984 that he was being placed on the restricted mailing list because of his having allegedly sent threatening letters to Ms. Murray. (See Rickards Affidavit at ¶¶ 12, 13 & Exh. 4.) The notice informed plaintiff that he could send general correspondence only to his mother and sister and that if he wished to correspond with other persons, he had to receive the prior approval of the Unit Manager. (*Id.* at Exh. 4.)

According to defendants, this matter came to the attention of the FCI when Ms. Murray telephoned Warden Quinlan to complain about the letters, and, at Quinlan's request, sent him copies of those letters. (Quinlan Sept. 11, 1984 Affidavit at ¶ 12.) Acting Warden Burke and Warden Quinlan's secretary, Marcy K. Grabowski, both read one or more of the letters, and describe them as threatening in tone. (See Burke Affidavit at ¶ 7; Grabowski Affidavit at ¶ 3.) Defendants are now unable to locate copies of those letters, and plaintiff, although conceding that he did write to Ms.

Murray, denies that the letters contained "physical" threats. (*See* Plaintiff's "Affidavit" filed June 1, 1984, at fourth page, ¶ 4.)

### E. *Plaintiff's Second Furlough Request*

Plaintiff made a second request for a furlough, on February 23, 1984. (Complaint at ¶ 7.) A preliminary review of plaintiff's file by prison officials revealed a New York State detainer from the Central Warrant Unit, New York City, which had been filed against plaintiff on December 5, 1983. (Brown Affidavit at ¶ 6.) Because of that detainer, which was based on a forgery charge, plaintiff was notified in writing on March 1, 1984 that his request for a furlough had been denied. (Complaint at ¶ 7.) Plaintiff contested the existence of the detainer and produced a Certificate of Disposition (Brown Affidavit at ¶ 6 & Exh. C) showing that certain cases had been dismissed and sealed. It is unclear from the Certificate, however, whether that document referred to the same charge as had given rise to the detainer, since the cases listed on the Certificate had different identifying numbers from that found in the detainer. (*Id.* at ¶ 6.)

**2.** Although plaintiff claims that the document reporting the vacating of the detainer had been doctored in an effort to conceal the ongoing conspiracy against him by prison officials, he offers nothing in support of this conclusion except his own speculation. (*See* p. 838 *infra.*)

**3.** At the outset, I note that defendants argue that the complaint should be dismissed against them in their individual capacity for insufficiency of service pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Specifically, defendants claim that no acknowledgement of service has been received from them thereby rendering service pursuant to Rule 4(c)(2)(C)(ii) of the Federal Rules of Civil Procedure ineffective, and no alternative service has been attempted. It is uncontested that the United States Marshal served the defendants by mailing copies to their offices by certified mail and defendants did not return their acknowledgement of service. Under these facts, defendants' argument for dismissal must be rejected. *See Morse v. Elmira Country Club,* 752 F.2d 35 (2d Cir.1984). The goal of Rule 4 of the Federal Rules of Civil

To clarify the matter, on March 5, 1984 the Record Office of FCI forwarded a disposition request to the Central Warrant Unit regarding the detainer and requested confirmation and a certified copy of the detainer. On April 30, 1984 FCI finally received from the Central Warrant Unit a notice that the detainer had been vacated four days before, on April 26, 1984. (Brown Affidavit, ¶ 7 & Exhs. E & F.)[2]

### F. *Plaintiff's Allegations of Other Harassment*

Plaintiff alleges in vague terms that defendant Brown attempted to prevent him from doing his legal work, apparently by removing a typewriter from his cell, but plaintiff does not specify the basis for his claim. Brown states in his affidavit—and plaintiff has not disagreed—that he simply removed from plaintiff's room a typewriter that belonged in a prison typing room to which sixty-four (64) inmates must have access. (Brown Affidavit, ¶ 10.) Plaintiff also alleges that his room is searched almost daily and that he fears for his life. (*See* Motion for Preliminary Injunction.)

### III. *Analysis*[3]

### A. *Introduction*

■ Plaintiff seeks principally money damages against the various government

Procedure is to insure actual notice, *see Hanna v. Plummer,* 380 U.S. 460, 462 n. 1, 85 S.Ct. 1136, 1139 n. 1, 14 L.Ed.2d 8 (1965), which defendants have plainly received, as evidenced by their motion to dismiss. Consistent with that principle, courts have routinely declined to dismiss a complaint for insufficiency of service where, as here, there are other methods for valid service available to plaintiff, *see, e.g., Alexander v. Unification Church of America,* 634 F.2d 673, 675 (2d Cir.1980); *Securities & Exchange Commission v. Gilbert,* 82 F.R.D. 723, 727 (S.D.N.Y.1979), and where defendant has suffered no prejudice. *See, e.g., Rose v. Koch,* 465 F.Supp. 1157, 1159 (E.D.N.Y.1979); *Florey v. Air Line Pilots Ass'n, Int'l,* 439 F.Supp. 165, 168 (D.Minn.1977), *aff'd,* 575 F.2d 673 (8th Cir. 1978). Plaintiff here was proceeding *in forma pauperis* pursuant to 28 U.S.C. § 1915 and properly requested the United States Marshal to serve the summons and complaint on defendants. Fed.R.Civ.P. 4(c)(2)(B)(i). Apparently, the Marshal served by mail pursuant to the new Rule 4(c)(2)(C)(ii) of the Federal Rules of Civil Procedure, but either did not receive an ac-

employees named as defendants in this matter. Since there is no statutory authority for such relief, its basis must be found in the parallel lines of cases that have permitted aggrieved persons to pursue damage actions against government officials either directly under the Constitution or under the common law. The availability of such relief under either line of authority is, however, narrowly limited.

■ With respect to claims asserted under the common law, government officials have traditionally been held to be immune from tort liability for those acts "committed within the scope of their official duties requiring the exercise of judgment or discretion." *Huntington Towers, Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 870 (2d Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), *citing inter alia Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Howard v. Lyons*, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959); *Ove Gustavsson Contracting Co. v. Floete*, 299 F.2d 655; 658 (2d Cir.1962), *cert. denied*, 347 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050 (1963). *Accord, e.g., Evans v. Wright*, 582 F.2d 20, 21 (5th Cir.1978); *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution*, 566 F.2d 289, 293–94 (D.C.Cir. 1977) (*en banc*) *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978);

*Berberian v. Gibney*, 514 F.2d 790, 793 (1st Cir.1975). This immunity applies regardless of whether the tortious conduct was undertaken for malicious or otherwise improper motives. *See, e.g., Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

■ As for alleged constitutional torts, except for certain limited categories of federal officials, government employees do not enjoy the same absolute immunity from personal damage liability. *See, e.g., Butz v. Economou*, 438 U.S. 478, 495, 98 S.Ct. 2894, 2905, 57 L.Ed.2d 895 (1978).[4] Nonetheless, in recognition of the disruptive effect that the threat of such suits, as well as their pendency, can have on the performance by public officers of their official duties, the courts have hedged these types of actions with a number of procedural and substantive hurdles. First, unlike other litigation, complaints seeking damages from public officials must allege with great specificity the role of each defendant in the alleged wrong committed. *See, e.g., Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977); *Black v. United States*, 534 F.2d 524, 527–28 (2d Cir.1976). Second, as already suggested, the complaint must state a constitutional claim as distinguished from a claim arising under common law. *See,*

knowledgement of service or did not file such acknowledgement with this Court. Assuming *arguendo* that personal service would therefore be required under Rule 4 to effect valid service, dismissal for insufficiency of service is inappropriate here because there has been actual notice, because the Marshal could simply effect valid service by serving the defendants pursuant to Rule 4(d)(1), and because no prejudice has resulted to defendants. As one court has stated: "[p]laintiff has relied in good faith on the Marshal's program, and should not be penalized." *Florey v. Air Line Pilots Ass'n, Int'l, supra*, 439 F.Supp. at 168. "The federal marshal's involvement in summons service is what has generated the de facto if not the de jure presumption of validity attending it, and the relative leniency of the judge's attitude when called on to dismiss an action under old Rule 4 for want of service." *Changes in Federal Summons Service Under Amended Rule 4 of the Federal Rules of Civil Procedure*, 96 F.R.D. 81, 109 (1982).

This conclusion is supported by the Second Circuit's recent decision construing Rule 4(c)(2)(C)(ii). *Morse v. Elmira Country Club, supra*, 752 F.2d at 35. In addressing the question of when the applicable statute of limitations is tolled, the Court rejected the argument that received-but-unacknowledged mail service pursuant to Rule 4(c)(2)(C)(ii) should be rendered ineffective because of defendant's failure to acknowledge service. *Id.* at 39. As in *Morse*, defendants here have not given "adequate explanation why the acknowledgement was withheld ..., nor any proper basis for nullifying mail service deliberately left unacknowledged." *Id.* at 40. Justice and equity dictate that defendants should not be accorded a windfall for playing "dog in the manger." *Ibid.*

4. The exceptions include principally judges, administrative judges, legislators, the President, and prosecutors to the extent that they are carrying out the official functions of their offices.

*e.g., Paul v. Davis,* 424 U.S. 693, 711–14, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976); *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 395–97, 91 S.Ct. 1999, 2004–05, 29 L.Ed.2d 619 (1971). Third, the defendant has available to him a so-called qualified immunity defense, which is premised upon the notion that damage liability should not be imposed on government officials or employees, even for constitutional torts, if they acted reasonably under the circumstances. As formulated by the Supreme Court, this defense applies to those actions that, although ultimately determined to be unconstitutional, did not violate any constitutional rights that were "clearly established" at the time the actions were undertaken. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). *See also Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974).[5] Fourth, unlike the case with other civil litigation, the Supreme Court has encouraged the use of motions to dismiss or for summary judgment to terminate *Bivens* -type lawsuits prior to trial based upon an immunity defense. *See, e.g., Harlow v. Fitzgerald, supra,* 457 U.S. at 819 n. 35, 102 S.Ct. at 2739 n. 35; *Butz v. Economou, supra,* 438 U.S. at 507–08, 98 S.Ct. at 2911. Indeed, in *Harlow* the Court directed that the immunity issue is to be litigated first and that no discovery may proceed unless the Court rejects the defendants' immunity claims. 457 U.S. at 817–18, 102 S.Ct. at 2738–39.[6]

For the reasons that follow, I conclude that—except with respect to the limitation on plaintiff's mail correspondence—none of the acts alleged by plaintiff constitutes a constitutional violation, and as to that one arguable violation, defendants have established the reasonableness of their conduct under the *Harlow* standards.[7]

### B. *Application of the Governing Standards*

I note a certain tension between the general principles applicable to plaintiff's claims. The plaintiff is proceeding *pro se* and, as such, his complaint must be liberally construed. *See, e.g., Hudson v. Palmer,* —— U.S. ——, —— — ——, 104 S.Ct. 3194, 3207–08, 82 L.Ed.2d 393 (1984) (Stevens, J., concurring in part and dissenting in part); *Boag v. MacDougall,* 454 U.S. 364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551 (1982) (*per curiam* ); *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (*per curiam* ). On the other hand, the United States Supreme Court, recognizing that suits against federal officers are easily commenced, oftentimes unfounded, and very costly, admonished that "insubstantial lawsuits" should be quickly terminated. *See Harlow v. Fitzgerald, supra,* 457 U.S. at 814, 818, 102 S.Ct. at 37, 39; *Butz v. Economou, supra,* 438 U.S. at 507–08, 98 S.Ct. at 2911. Moreover, since the plain-

---

**5.** *Harlow* itself represented a strengthening of the immunity defense. Under prior law a *Bivens* defendant was required to demonstrate not only objective reasonableness but also subjective good faith. *See, e.g., Butz v. Economou, supra,* 424 U.S. at 506–07, 98 S.Ct. at 2910–11.

**6.** Despite the prior admonition of *Butz* to use summary judgment aggressively to preclude meritless litigation, a number of courts resisted such a summary disposition of the merits when subjective good faith was in issue. *See, e.g., Slavin v. Curry,* 574 F.2d 1256, 1267 (5th Cir. 1978); *Landrum v. Moats,* 576 F.2d 1320, 1329 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978); *Brown v. Hilton,* 492 F.Supp. 771, 778 (D.N.J.1980); *Hurley v. Ward,* 451 F.Supp. 930, 932 (S.D.N.Y.1978). Because this line of decisions was inconsistent with the Supreme Court's policy disfavoring such lawsuits, the Court proceeded in *Harlow* to eliminate entirely the "good faith" element of the defense and to direct the lower courts to determine immunity as the first step in such litigation and prior to any discovery. 457 U.S. at 817–18, 102 S.Ct. at 2738–39.

**7.** Plaintiff seeks permanent injunctive relief as well as money damages. (Complaint at ¶ V.) Since, however, he complains of his treatment at a specific prison and has since been released from prison to a "halfway" house, (*see* Plaintiff's Notice of Objection, dated September 25, 1984 at p. 3), his injunctive claims are moot. *See, e.g., Preiser v. Newkirk,* 422 U.S. 395, 401–02, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir. 1976); *Ross v. Mebane,* 536 F.2d 1199, 1202 (7th Cir.1976); *Lewis v. D.C. Dep't of Corrections,* 533 F.2d 710, 711 (D.C.Cir.1976).

tiff's complaint has been fleshed out by affidavits on both sides, there is less reason to fear that an inartfully pleaded but meritorious claim may escape judicial scrutiny.

There is likewise an uneasy tension in the principles governing a convicted prisoner's constitutional rights. Convicted prisoners clearly do not lose all their constitutional rights upon lawful imprisonment. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). "There is no iron curtain drawn between the Constitution and the prisoners of this country," *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), and a prisoner "is no longer treated as a slave, stripped of all protected liberty interests." *Pugliese v. Nelson*, 617 F.2d 916, 921 (2d Cir.1980).

It is equally clear, however, that prisoners' constitutional rights are not coextensive with those of free citizens. *See, e.g., Bell v. Wolfish, supra*, 441 U.S. at 545–47, 99 S.Ct. at 1877–78; *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by our penal system," *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), and "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitations or retraction of the retained constitutional rights of ... convicted prisoners." *Bell v. Wolfish, supra*, 441 U.S. at 546, 99 S.Ct. 1878. The courts must therefore accord "wide-ranging deference" to prison officers

in their administration of the day-to-day operations of the prison. *See id.* at 547, 99 S.Ct. at 1878; *Rhodes v. Chapman*, 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981). With these principles in mind, I treat plaintiff's claims seriatim.

### 1. *Furlough and Vacation*

Plaintiff was denied two requests for furloughs and one request for a vacation, and alleges that those denials were improper.[8] Defendants contend that their denials were not only proper, but required under Bureau of Prison regulations.

As noted, in a *Bivens* action plaintiff may obtain relief only for constitutional wrongs. The initial question thus posed is whether furloughs or vacations are within the purview of the "liberty" protected by the Due Process Clause of the Fifth Amendment. *Marciano v. Coughlin*, 510 F.Supp. 1034, 1037 (E.D.N.Y.1981). *Cf. Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir.1984); *Sher v. Coughlin*, 739 F.2d 77, 80–81 (2d Cir.1984).

■ Liberty interests protected by the Due Process clause may arise from two sources—the Due Process clause itself and federal statutes or regulations. *See Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); *cf. Greenholz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7–8, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979). "[O]nly a very narrow range of protected liberty interests" emanate from the Due Process Clause itself, *Hewitt v. Helms, supra*, 459 U.S. at 467, 103 S.Ct. at 869, and any right a prisoner may have to furloughs and vacations falls outside of that range.[9]

---

**8.** The plaintiff's claims with respect to the denials of his requests for furloughs and a vacation are sufficiently similar to justify treating them together.

**9.** *Cf. Hewitt v. Helms, supra*, 459 U.S. at 468, 103 S.Ct. at 869 (freedom from administrative segregation is not "an interest independently protected by the Due Process Clause"); *Greenholz v. Nebraska Inmates, supra*, 442 U.S. at 7, 99 S.Ct. at 2104 (no "constitutional or inherent right" to parole); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) ("the

Due Process Clause in and of itself" does not protect against transfer to another institution); *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) ("the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison"). Furlough and vacation certainly entail less of an interest than those at stake in the above cases. Even though a prison policy may cause a "grievous loss," the Supreme Court has rejected "the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right." *Moody v. Dag-*

■ Nonetheless, a constitutionally protected liberty interest may be created by statute or regulation. *Pugliese v. Nelson, supra*, 617 F.2d at 922; *see, e.g., Wolff v. McDonnell, supra; Meachum v. Fano, supra*. To have such an effect, however, the statute or regulation conferring benefits must substantially limit the prison administrator's discretion. *See Hewitt v. Helms, supra*, 459 U.S. at 471–72, 103 S.Ct. at 871–72; *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 466–67, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981); *Pugliese v. Nelson, supra*, 617 F.2d at 922–25; *see also Marciano v. Coughlin, supra*, 510 F.Supp. at 1037. Moreover, in construing such statutes or regulations the Supreme Court has cautioned that courts should be hesitant to find due process liberty interests. *See Hewitt v. Helms, supra*, 459 U.S. at 470, 103 S.Ct. at 870.

■ In this case, although there are Bureau of Prisons internal rules governing the grant of furloughs and vacations, they do not establish the type of discretion-limiting standards that would give an inmate a liberty interest.

The basic authority for granting vacations in 1983 was found in 28 C.F.R. § 345.21(a), which provides in relevant part that "[a]n inmate *may* be granted vacation credit when the inmate's work performance (quality, attendance, attentiveness and adherence to industry operating regulations) justifies it." (emphasis added.) This regulation, however, applies on its face only to inmates employed by the Federal Prison Industries, Inc. (referred to as "UNICOR"), *see* 28 C.F.R. § 345.10, and apparently has no specific applicability to

other inmates.[10] In the apparent absence of specific Bureau provisions governing non-UNICOR inmates, the applicable regulation with respect to plaintiff—who apparently was not working for UNICOR—was an Institution Supplement promulgated by the FCI at Otisville, which provides as follows:

> An inmate meeting the following criteria *may* receive a one week paid vacation at the average prevailing rate of pay:
>
> a. Twelve (12) consecutive months on an institution work assignment;
>
> b. Recommendation by the work supervisor based upon satisfactory job performance;
>
> c. At least six (6) months without an incident report in the moderate, high or greatest category;
>
> d. No excessive absenteeism.

(Rickards Affidavit at Exh. 5, at ¶ 3 (emphasis added).) None of the 1983 provisions create any entitlement to a vacation, and indeed the limitations on the discretion of the Warden establish quite the reverse—*prohibiting* the granting of a vacation in certain circumstances.

As for furloughs, the applicable Bureau regulations specify that "[a] furlough is not a right, but a privilege granted an inmate under prescribed conditions...." 28 C.F.R. § 570.30. The regulations then specify a series of conditions that must be satisfied before a furlough may be granted, but at no point do they require the granting of a furlough even if all the specified conditions are satisfied. *See* 28 C.F.R. §§ 570.32, 570.34–.35.[11] Again, it is apparent that the regulations were not intended

---

*gett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976) (citing *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)).

**10.** Since the time of the events at issue in this lawsuit, the Bureau of Prisons has promulgated a final rule on inmate work and performance pay which provides comprehensive coverage and governs the granting of vacations as well as vacation credit. *See* 49 Fed.Reg. 38914 *et seq.* (Oct. 1, 1984); *see also* 49 Fed.Reg. 44059 (Nov. 1, 1984).

**11.** In authorizing the granting of furloughs the regulations consistently employ the term "may". *See, e.g.,* 28 C.F.R. § 570.32(a) ("An inmate may be authorized a furlough...."); *id.* at § 570.-32(b) ("the Warden may recommend a furlough...."). The word "shall" appears only in provisions limiting the grant of furloughs or establishing required procedures. (*See* 28 C.F.R. §§ 570.33(a), 570.34(e)(6), 570.36(b)–(c)).

to create any entitlement to a furlough under any circumstances.

The unavoidable conclusion from the foregoing is that no due process liberty interest is implicated in the denial to plaintiff of a vacation and furlough. *Cf., e.g., Marciano v. Coughlin, supra,* 510 F.Supp. at 1037 (no liberty interest created by New York furlough statute); *Wright v. Cuyler,* 517 F.Supp. 637, 641–42 (E.D.Pa.1981) (no liberty created by Pennsylvania furlough statute). *Accord, Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976) (no due process protections required in determining "eligibility for rehabilitative programs in the federal system"); *Pugliese v. Nelson, supra,* 617 F.2d at 923–24 & nn. 5 & 6 (no due process liberty interest in avoiding prisoner classification that delayed or precluded participation in institutional programs, including among other things, furlough and work release). This result is buttressed by the lack of "explicitly mandatory language" such as "shall," "will" or "must" in the pertinent regulations. *Cf. Hewitt v. Helms, supra,* 459 U.S. at 471–72, 103 S.Ct. at 871–72.

In sum, plaintiff had no due process right to furlough or vacation from work and denial of these benefits does not give rise to a constitutional claim.

## 2. *Restricted Mailing Privileges*

On January 20, 1984 plaintiff was notified in writing that he was being placed on a restricted mailing list because Ms. Murray had informed the prison that plaintiff had sent her threatening letters. The notice informed plaintiff that he was permitted to write to his mother and sister, but that if he wished to correspond with others he would need Rickards' approval. Defendants contend that their action was pursuant to Bureau of Institutional policy.[12] The restriction did not apply to special mail (*i.e.,* legal mail of any sort) and thus the issue of plaintiff's access to the courts is not implicated. Reading plaintiff's complaint broadly, as we must, plaintiff's allegations may be viewed as asserting a possible violation of his first amendment rights. Nonetheless, his claim for damages against defendants must be rejected under the teaching of *Harlow.*

First amendment protections are perhaps the most jealously guarded of prisoners' rights. It is well settled that prisoners do retain some rights in corresponding with those outside of prison, *see, e.g., Procunier v. Martinez,* 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); *Davidson v. Scully,* 694 F.2d 50, 54 (2d Cir.1982); *Heimerle v. Att'y Gen'l, United States of America,* 558 F.Supp. 1292, 1294–95 (S.D. N.Y.1983), although the parameters of

---

**12.** The relevant provisions of 28 C.F.R. Part 540, Subpart B-Correspondence, and the Institutional Supplement are set forth below:

§ 540.14 Restricted General Correspondence
(a) The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification. Determining factors include the inmate's:
(1) involvement in any of the activities listed in § 540.13(e); ...
28 C.F.R. § 540.14(a)(1) (1983)
§ 540.13 General Correspondence
... (e) The warden may reject correspondence sent by or to an inmate if it contains any of the following:
... (4) *Threats,* extortion, obscenity, or gratuitous profanity.
28 C.F.R. § 540.13(e)(4) (1983) (emphasis added).
§ 540.2 Definitions
(a) "General Correspondence" means incoming or outgoing correspondence other than "special mail." ...

(2) "Restricted General Correspondence" means general correspondence which is limited to a list of authorized correspondents. 28 C.F.R. § 540.2(a)(2) (1983).
§ 540.14 Restricted General Correspondence ... (d) When an inmate is placed on restricted general correspondence the inmate may ...:
(1) correspond with his spouse, mother, father and siblings ...;
(2) request other persons also to be placed on the approved correspondence list, subject to investigation, evaluation, and approval by the warden....
*28 C.F.R. § 540.14(d)(1) & (2) (1983).*
The relevant Institutional Supplement adds only that the warden's discretion in these matters is delegated to the UCT and that inmates on the restricted list will be permitted to correspond with up to 15 persons. Institutional Supplement 5265.6, Correspondence, §§ (5)(b), (6)(a). *See* Richards Affidavit at Exh. 4.

those rights are not easily defined. The Supreme Court has mandated that prison regulations that infringe on the prisoner's right to communicate with others by mail must "further an important or substantial governmental interest unrelated to the suppression of expression" and "be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811. The regulation therefore not only has to be rationally related to a proper purpose but cannot be overbroad.

■ Defendants contend that the mail limitation here meets the test enunciated in *Martinez* and that plaintiff has therefore failed to state a claim under *Bivens.* Bearing in mind that a civil rights complaint will not be dismissed "unless it appears beyond doubt that the plaintiff can prove no sets of facts in support of his claim which entitle him to relief", *Batista v. Rodriquez,* 702 F.2d 393, 397 (2d Cir.1983) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)), I cannot agree with defendants that plaintiff fails to state a constitutional claim.

In *Martinez,* the Court considered a regulation that permitted censorship of a prisoner's correspondence if it was found to contain statements that "unduly complain" or "magnify grievances," "express inflammatory political, racial, religions, or other views," or are "defamatory or otherwise inappropriate." *Id.,* 416 U.S. at 415, 94 S.Ct. at 1812. The Court found the regulation unconstitutional because it did not further a governmental interest unrelated to the suppression of speech [13] and was overbroad. *Id.,* at 415–16, 94 S.Ct. at 1812. The Court explicitly left open the question whether "a temporary prohibition of an inmate's personal correspondence as a disciplinary sanction ... for violation of prison rules" would be valid. *Id.,* at 412 n. 12, 94 S.Ct. at 1811 n. 12.

Many of the cases on prisoners' first amendment mail rights, although instructive, do not dispose of the question before us because they specifically address the censorship, and not the prohibition, of mail. *See, e.g., Davidson v. Scully, supra,* 694 F.2d at 50; *Wolfish v. Levi,* 573 F.2d 118, 130 (2d Cir.1978), Aff'd in part and Rev'd in part, *sub nom, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Sostre v. McGinnis,* 442 F.2d 178, 199–201 (2d Cir.1971); *Heimerle v. Att'y Gen'l, United States of America, supra,* 558 F.Supp. at 1294–95; *Golden v. Coombe,* 508 F.Supp. 156, 159–60 (S.D.N.Y.1981). Censorship differs from prohibition in at least two important respects. First, censorship poses the danger of non-neutral suppression of expression whereas a blanket prohibit may not. Second, however, a blanket prohibition may be a greater impediment to free expression because it acts more broadly as a prior restraint. *Guajardo v. Estelle,* 580 F.2d 748, 755 (5th Cir. 1978).

The cases most closely on point are not in this Circuit. In *Guajardo,* the Fifth Circuit considered a Texas Department of Corrections rule very similar to the one applied to plaintiff in this case. The rule permitted the prisoner to correspond with his family and up to ten other persons with the prior approval of the institution.[14] *Id.* at 753. The Court, relying on *Martinez,* found the rule to be an unconstitutional abridgement of first amendment rights. *Id.* at 755. *Guajardo* is distinguishable from the present case to the extent that the Texas rule applied to all prisoners, whereas the regulation here was applied to plaintiff as a disciplinary measure. The Supreme Court has suggested that this difference is not insignificant. *Procunier v. Martinez, supra,* 416 U.S. at 412 n. 12, 94 S.Ct. at 1811 n. 12.

In *Schlobohm v. United States Attorney General,* 479 F.Supp. 401 (M.D.Pa.1979),

---

**13.** Legitimate governmental interests include security, order, and rehabilitation. *Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811.

**14.** The rule in *Guajardo* applied only to general correspondence and not to legal correspondence.

which the defendants cite, the court held that "the punishment of indefinite mail restriction is a legitimate exercise of the prison administration's disciplinary power." *Id.* at 404. The prisoner in that case was disciplined and placed on a restricted mailing list for violating the correspondence regulations by corresponding with an inmate at another penal institution. The Court discussed at length the soundness of the regulation prohibiting inmate-to-inmate correspondence and found it constitutional. *Id.* at 402–03. It then concluded in a single paragraph that imposition of an indefinite mail restriction was also valid. The only rationale provided for this conclusion was the danger that the inmate may attempt to communicate with another inmate through a third-party. *Id.* at 403–04. I find that conclusion unpersuasive, and in any event not especially pertinent to the present case.

One year later the same court in *Intersimone v. Carlson,* 512 F.Supp. 526 (M.D.Pa. 1980) struck a significantly different balance in light of the Third Circuit's decision in *St. Claire v. Cuyler,* 634 F.2d 109 (3d Cir.1980). *See* 512 F.Supp. at 530. *Intersimone* may be factually the most apposite case since the plaintiff there was placed on "restricted general correspondence" pursuant to the predecessor of the current 28 C.F.R. § 540.13(e)(4).[15] In that case, the prison administrators placed the prisoner on "restricted general correspondence" at a judge's request because the prisoner had continually attempted to communicate with the jurors who had convicted him, notwithstanding the judge's order to not do so. *Intersimone v. Carlson, supra,* 512 F.Supp. at 528. Applying the test announced by the Supreme Court in *Martinez,* the Court found the application of § 540.14(e)(4) to the prisoner to be overbroad and violative of his first amendment rights. *Id.* at 531.

[T]o protect [the] governmental interest, it was only necessary to prohibit Plaintiff from mailing correspondence to members of the jury in his criminal trial. The use of an authorized correspondent's list in this instance was an unreasonable, arbitrary and purposeless infringement of the First Amendment.

*Id.* at 530. The analysis employed by the court is equally applicable here, where defendants placed plaintiff on restricted general correspondence rather than simply prohibiting mail to Ms. McGill.

Although the Second Circuit has not considered the question at hand, we note that it has recently been more protective of prisoner's first amendment rights than in the past. *Compare Davidson v. Scully, supra,* 694 F.2d 50 *with Sostre v. McGinnis, supra,* 442 F.2d 178; *see also Heimerle v. Att'y Gen'l, United States of America, supra,* 558 F.Supp. at 1294–95. I need not decide the extent of plaintiff's first amendment rights or whether the regulation here was unconstitutional on its face or as applied to plaintiff. I only conclude that plaintiff does not fail to state a constitutionally cognizable claim by his complaint and that defendants have not offered, on the present record, a sufficiently cogent justification for application of the regulation to plaintiff to obtain summary judgment on the merits. Nonetheless, defendants' motion for summary judgment should be granted on another ground.

■ Even though plaintiff's constitutional challenge cannot be dismissed at this stage on the merits, it may be dismissed on grounds of qualified immunity if defendants can show that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738; *Wyler v. United States,* 725 F.2d 156, 159 (2d Cir.1983). The defense of qualified or "good faith" immunity is of course "available to prison officials as a defense from liability for damages for actions taken in their official capacities." *Security and Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 210 (2d Cir.1984) (hereinafter "*S.L.E.E. v.*

---

**15.** 28 C.F.R. § 540.13(e)(4) then permitted such mail restrictions for "[c]lear harassment of a member of the public...." *Intersimone v. Carlson, supra,* 512 F.Supp. at 528.

*Carey* "). *See, e.g., Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *McCann v. Coughlin*, 698 F.2d 112, 124 (2d Cir.1983).

Applying the *Harlow* standard to the present case, I conclude that defendants "operated in an area in which the law was not charted clearly." *S.L.E.E. v. Carey, supra*, 737 F.2d at 211.[16] Accordingly defendants' motion for summary judgment should be granted.

■ As already noted, the law with respect to the rights of prisoners to correspond with others is far from well established, and there is relatively little case law on the subject in this Circuit. Moreover, the most pertinent decisions—from the Middle District of Pennsylvania and the Fifth Circuit—are not necessarily consistent. Furthermore, the justification for limitations on correspondence in a given case could well turn on the particular circumstances of that case, and the record in this case is sufficient to conclude that the individual defendants responsible for application of the regulation had at least a colorable basis for its imposition if in fact it is not unconstitutional on its face. All of these factors reinforce the unavoidable conclusion that in limiting plaintiff's mailing privileges, defendants did not violate any clearly settled governing law and thus are entitled to the immunity defense provided by *Harlow.*

In reaching this conclusion, I note that there are no material issues of fact. The only issue that might arguably be considered to be in dispute is the specific nature of the allegedly threatening letters to Ms. Murray. Throughout his pleadings, plaintiff has not denied that he wrote such letters, only that the defendants did not produce them to him. Indeed in plaintiff's affidavit in support of his "Motion Showing Cause Why Summary Judgment Should not be Granted," dated May 24, 1984, he states: "plaintiff admits writing a letter to Marie McGill, but at no time [were] threats made

to '*physically*' harm her or anyone." (emphasis added)

Assuming plaintiff's assertion to be true, he nonetheless cannot create a triable issue as to the following: that Ms. Murray called Otisville about one or more letters that she had received, that she sent the letter or letters to Otisville, and that the letters were construed by the prison staff as threatening in some respect. Since 28 C.F.R. § 540.13(e)(4) is not by its terms limited to physical threats, I find that the defendants relied on the Bureau of Prison rules and regulations in effect at the time. *Cf. S.L.E.E. v. Carey, supra*, 737 F.2d at 211 (prison officials given immunity for strip searches and body cavity searches found to be unconstitutional because law was unclear and officials relied, in good faith, upon the prison's rules and regulations).

■ I also note that plaintiff has not demonstrated any injury from being placed on restricted general correspondence. Specifically, plaintiff has not alleged that he requested and was denied permission to correspond with others. Where no damage is shown from interference with a prisoner's mailing privileges, dismissal or summary judgment is properly granted. *See, e.g., Morgan v. Montanye*, 516 F.2d 1367, 1372, *rehearing denied*, 521 F.2d 693 (2d Cir. 1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976); *Golden v. Coombe, supra*, 508 F.Supp. at 160.

### C. *Miscellaneous Claims*

In his complaint plaintiff also alleges that defendants tampered with his mail and that defendant Pugh "wilfully, intentionally and maliciously alter[ed] plaintiff's legal document to deprive plaintiff of institutional privileges." Complaint, ¶ 10.

■ As to plaintiff's claim of mail tampering, it is clear in this Circuit that "conclusory," "vague" or "general allegations" of deprivation of constitutional rights will be dismissed. *Ostrer v. Aronwald, supra*, 567 F.2d at 553. Plaintiff

---

16. *See supra* pp. 830–831.

must set out in detail the factual basis of his claim and cannot just rely on conclusory statements. *Id.; Black v. United States, supra,* 534 F.2d at 527–28. In this case, neither in his complaint nor in his subsequent papers has plaintiff pointed to specific instances of such alleged tampering nor has he identified who allegedly tampered with it.

The only elucidation offered by plaintiff is found in his "Motion Showing Cause Why Summary Judgment Should Not Be Granted" dated June 22, 1984. Plaintiff attached to that motion a copy of a certified mail return receipt as evidence that his mail was tampered with. (*Id.,* Exhibit J.) Plaintiff's claim in this respect is premised solely on the fact that the initials of the prison official on the receipt were not the same as the initials on his previous receipts, and that there was no postmark to indicate delivery. (*Id.,* at p. 1.)

I find plaintiff's assertion in this matter unpersuasive. First, plaintiff has not added anything of substance to the vague allegations in his complaint and has not identified which defendants he claims were guilty of the alleged wrong. Indeed, there is no indication that any of the defendants were in any way involved with that mailing. Second, the receipt refutes rather than supports plaintiff's claim. The receipt contains the signature and address of the recipient, and was dated and signed by a postal employee. The lack of a postmark on the front of the receipt is insignificant since the receipt clearly states that the postmark may be on the reverse side, which plaintiff does not supply. Moreover, even if there were no postmark on the reverse side, a failure on the part of the Postal Service cannot give rise to a constitutional claim against the defendants here.

■ Plaintiff also alleges that defendant Pugh altered a letter from the New York City Central Warrant Unit to Otisville, which reported that plaintiff's detain-er had been vacated on April 26, 1984.[17] (Motion Showing Cause Why Summary Judgment Should Not Be Granted, p. 1 & Exhibit G.) Plaintiff alleges that Pugh altered the date on this document to conceal the fact that the detainer had been vacated before April 26, 1984. The copy of the document submitted by plaintiff is the same as the copy annexed to defendant Brown's Affidavit. (Brown Affidavit, Exhibit F.) Both copies show no indication of alteration or forgery. The letter was on New York City letterhead and was stamped received on April 30, 1984, as sworn to by Brown. *Id.,* ¶ 7. I find plaintiff's conclusory allegations in this respect entirely unsubstantiated and insufficient to avoid summary judgment.[18]

"[P]laintiff cannot defeat a motion for summary judgment by merely stating the concusory allegations in his complaint." *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981); *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Since insubstantial and unwarranted suits against public officials should not be permitted to go to trial defendants' motion for summary judgment on the claims of mail tampering and alteration of plaintiff's document should be granted. *See Harlow v. Fitzgerald, supra,* 457 U.S. at 819 n. 35, 102 S.Ct. at 2739 n. 35.

## D. *Plaintiff's Motion for a Preliminary Injunction*

■ Plaintiff's remaining claims are asserted in his motion for a preliminary injunction. Treated as an application for preliminary relief, that motion must be denied as moot since plaintiff was released from Otisville on August 30, 1984. (Plaintiff's Notice of Objection, dated September 25, 1984 at p. 3.) *See, e.g., Preiser v. Newkirk, supra,* 422 U.S. at 401–02, 95 S.Ct. at 2334; *Mawhinney v. Henderson, supra,* 542 F.2d at 2; *Ross v. Mebane, supra,* 536 F.2d at

---

**17.** *See supra* p. 829.

**18.** Even if this letter were forged, it is doubtful that this would give rise to a constitutional claim since the only result of the letter plaintiff that alleges is the denial of a request for furlough. *See* discussion *supra,* pp. 832–834.

1202; *Lewis v. D.C. Dep't of Corrections, supra,* 533 F.2d at 711.

Construing plaintiff's motion liberally, I will treat it alternatively as a motion to supplement his complaint with additional damage claims against the named defendants. These additional allegations concern asserted denial of access to a typewriter, searches of plaintiff's cell and miscellaneous harassment. Again, however, plaintiff fails to allege a sustainable claim.

### 1. Access to a Typewriter

Plaintiff vaguely alludes to interference with his use of a typewriter, which allegedly compromised his ability to do his legal work. Defendant Brown by sworn affidavit explains that he found a typewriter in plaintiff's room that did not belong there and returned it to the typing room, where it belonged. (Brown Affidavit, ¶ 10.) Since plaintiff does not contest Brown's version of the facts, I take them as true. *Cf. United States v. Wyler, supra,* 725 F.2d at 160.

While inmates retain their constitutional right of access to the courts, *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), this Circuit has held that there is "no constitutional right to a typewriter as an incident to the right of access to the courts." *Wolfish v. Levi,* 573 F.2d 118, 132 (2d Cir.1978), *rev'd on other grounds sub. nom., Bell v. Wolfish, supra,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447; *accord, Twyman v. Crisp,* 584 F.2d 352, 358 (10th Cir.1978); *Ramos v. Lamm,* 485 F.Supp. 122, 166 (D.Colo.1979), *aff'd,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

■ Since plaintiff has no constitutional right to a typewriter, the prison policy of keeping the typewriters in the typing room for use by all inmates cannot be unconstitutional. Plaintiff does not even allege that he was denied access to the typing room. Apparently, he was only prohibited from keeping the typewriter in his own room. That limitation does not give rise to a constitutionally cognizable claim.

### 2. Searches of Plaintiff's Cell

Plaintiff alleges that his room was searched almost daily. Defendant Brown in his affidavit only states that the unit procedure is to search all rooms at least once or twice a week. Since defendants have not specifically contested plaintiff's allegations, I take them as true.

The initial question, then, is whether a prisoner has a right under the Fourth Amendment to be free from repeated searches of his cell. In *Bell v. Wolfish,* the Supreme Court did not reach the question of whether convicted prisoners or pre-trial detainees have any fourth amendment rights. *Bell v. Wolfish, supra,* 441 U.S. at 556–58, 99 S.Ct. at 1883–84. The Court simply assumed for the purposes of that case that if any such rights existed, they were narrowly confined, and it then went on to hold that unannounced room searches at irregular intervals and visual body-cavity searches do not violate the fourth amendment. *Id.* at 557–58, 99 S.Ct. at 1883–84.

This past term, however, the Supreme Court squarely addressed the question of whether a prisoner "has a right of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches," and held that there is no such right. *Hudson v. Palmer, supra,* — U.S. at —, 104 S.Ct. at 3198. The Court found that "a right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.,* — U.S. at —, 104 S.Ct. at 3201. In explanation for this holding, the Court observed that "The uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administration in the constant fight against the proliferation of knives and guns, illicit drugs and other contraband." *Ibid.*

■ The Court in dictum also stated that respondent did not state a claim under

the fourth amendment even if the sole purpose of the searches was to harass. *Ibid.* Necessarily, then, *Hudson v. Palmer* compels the conclusion that plaintiff here does not state a claim based upon the daily search of his cell. *See also Hanrahan v. Lane,* 747 F.2d 1137, 1139 (7th Cir.1984) (per curiam).

### 3. *Miscellaneous Claims of Harassment*

Plaintiff also vaguely alleges that he was discriminated against on religious grounds and that he was in fear of his life. In his Motion for Preliminary Injunction, he states:

> My room is being searched almost daily, and some of my religious material that I wrote is missing. I wrote Congressman Ed Townes ... telling him I feared for my life from members of the Staff. They have nearly killed a "paraplegic" in segregation.

In his Affidavit in support of his Motion Showing Cause Why Summary Judgment should not be Granted, plaintiff amplified these allegations in the following manner:

> Plaintiff insist[s] and still fear[s] for his life with good reasons, plaintiff cannot expect to be protected from those who seeks to snuff out his life.... Plaintiff have been denied and harassed solely because of his religious beliefs, and failure to submit to the defendants 'persecution' and 'oppression.' It's true that prisoners of other ISLAMIC SECT are given furloughs and other institutional privileges, but not me follower of the Honorable Elijah Muhammad.

"This Court has repeatedly held that complaints concerning only 'conclusory,' 'vague' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald, supra,* 567 F.2d at 553. The Second Circuit in that case found the allegations insufficient because they "fail[ed] to specify in detail the factual basis necessary to enable appellees intelligently to prepare their defense." *Ibid.; see also Black v. United States, supra,* 534 F.2d at 527–28. Likewise, "it is clear that a plaintiff

cannot defeat a motion for summary judgment by merely stating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover." *Contemporary Mission, Inc. v. United States Postal Service, supra,* 648 F.2d at 107.

██ Under the principles enunciated by this Circuit, I find plaintiff's allegations of religiously-based harassment impermissibly vague and conclusory, particularly in view of the specific denials by defendants. Plaintiff does not point to specific instances of harassment or the specific people who allegedly harassed him. His conclusory allegations of "malice" and "retaliation" are simply insufficient to withstand a motion for summary judgment. *See, e.g., Harlow v. Fitzgerald, supra,* 457 U.S. at 817–18, 102 S.Ct. at 2738–39; *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Defendants' motion for summary judgment on these claims should therefore be granted.

### CONCLUSION

For the reasons stated, I recommend that defendants' motion to dismiss or for summary judgment should be granted.

Pursuant to Rule 7 of the Rules of Proceedings Before A U.S. Magistrate, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable David N. Edelstein, Room 2104, and to the chambers of the undersigned, Room 503.